UNITED STATES PAROLE
COMMISSION,
Appellant,

v.

Matthew NOBLE, Appellee.

No. 96–SP–578.

District of Columbia Court of Appeals.

Argued Dec. 4, 1996.

Decided April 17, 1997.

Elizabeth H. Danello, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and John M. Facciola, Assistant United States Attorneys, were on the brief, for appellant.

Beverly G. Dyer, Assistant Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, was on the brief, for appellee.

Mary L. Wilson, Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia as amicus curiae.

Before FERREN and SCHWELB, Associate Judges, and PRYOR, Senior Judge.

FERREN, Associate Judge:

The United States Court of Appeals for the District of Columbia Circuit has certified to this court, pursuant to D.C.Code § 11–723 (1995 Repl.), the following question:

Under District of Columbia law, given the facts described below, did the United States Parole Commission properly interpret sections 24–206(a) and 24–431(a) of the District of Columbia Code in deciding that, after revocation of a person's parole, time that the person spent on parole before revocation cannot be credited against his sentence?

*Noble v. United States Parole Comm'n,* 317 U.S.App. D.C. 304, 305, 82 F.3d 1108, 1109 (1996) (*Noble II* ). We answer the question in the affirmative.

## I.

Most of the relevant history is set forth in *Noble v. United States Parole Commission,* 887 F.Supp. 11 (D.D.C.1995) (*Noble I* ).[1] On December 5, 1978, Matthew Noble was convicted in the United States District Court for the District of Columbia of unlawful distribution of a controlled substance, 21 U.S.C. § 841(a) (1994). *See Noble I,* 887 F.Supp. at 11. The judge placed him on probation for three years. *See id.* at 11. According to the Commission's brief, while on probation Noble tested positive for opiates and preludin, missed several scheduled appointments, and was rearrested for a misdemeanor drug offense. On May 18, 1981, the district judge revoked Noble's probation and sentenced him to imprisonment in a federal facility for a year and a day. *See id.* The judge also ordered that, after Noble served his sentence, he was to serve a special parole term of two years. *See id.* On December 18, 1981, Noble was released on parole. *See id.*

While Noble was on parole, he was convicted in the Superior Court of distribution of a controlled substance, D.C.Code § 33–541(a) (1993 Repl.). According to Noble's brief, on November 15, 1982, he was sentenced to imprisonment for a period of one to three years and again was incarcerated in a federal institution.[2] In addition, the United States

1. Technically, there is no "record" for us to address in this case; the facts are limited to those presented in the federal courts' opinions and in the parties' briefs. For completeness of factual presentation, we rely primarily on the federal courts' opinions, but occasionally we cite a party's brief where the fact asserted is uncontested, is not critical to our decision, and presumably is an accurate presentation by an advocate who is also an officer of the court.

2. The primary responsibility for the incarceration of persons who violate District of Columbia criminal statutes, and for the supervision of such individuals, is lodged in the District government. *See United States v. District of Columbia,* 283 U.S.App. D.C. 130, 134, 897 F.2d 1152, 1156 (1990). As a result of overcrowding at District of Columbia facilities, however, some District of Columbia offenders are housed at federal correctional institutions. *See id.* (citing D.C.Code §§ 24–402, –410, –425 (1996 Repl.)). When a

Parole Commission revoked Noble's special parole term which had been imposed in May 1981 for his federal violation. The federal parole authorities do not credit defendants for time spent on parole ("street time") when a special parole term is revoked, *see* 21 U.S.C. § 841(c) (1982),[3] and it would appear that Noble accordingly forfeited the time he already had spent on parole for his federal offense.

On September 21, 1984, Noble was released on parole once again. While on parole, however, he was convicted in the Superior Court of the District of Columbia of unlawful distribution of a controlled substance, D.C.Code § 33-541 (1993 Repl.). *See Noble I,* 887 F.Supp. at 12. On September 13, 1985, Noble was sentenced to serve a prison term of two and one-half years to seven and one-half years. *See id.* at 12. In conformity with 18 U.S.C. §§ 4161, 4205 (1994), the United States Bureau of Prisons aggregated Noble's District of Columbia sentence and the remainder of his federal parole term to a total prison sentence of 110 months and seven days. *See Noble I,* 887 F.Supp. at 12. Ninety months of this aggregate term represented Noble's local District of Columbia sentence. *See id.*

In March 1988, Noble again was released on parole. *See id.* Although most of his remaining sentence pertained to a District of Columbia offense, he was paroled from a federal institution under supervision of the United States Parole Commission. *See id.* at 12 n. 2. Noble remained on parole for more than five years, but in May 1993 a controlled substance was detected in his urine.[4] *See id.* at 12. On December 1, 1993, the Commission again revoked Noble's parole. The

Commission refused to credit Noble for the "street time" he had served on parole for the District of Columbia offense before parole was revoked. *See id.* Noble was returned to prison, with a new "full term expiration date" of February 21, 1999. *See id.* Finally, on October 7, 1994, with 1,597 days remaining on his sentence, Noble was released on parole once again. *See id.*

On January 27, 1995, pursuant to 28 U.S.C. § 2241 (1994), Noble filed a petition for a writ of habeas corpus in the United States District Court for the District of Columbia. Naming the Commission as the sole respondent, Noble alleged that by denying him credit for 1,479 days which he had served on parole on his District of Columbia sentence, the Commission had violated D.C.Code § 24-431(a) (1996 Repl.). Judge Sporkin granted Noble's petition, concluding that § 24-431(a) authorizes credit for street time even when a prisoner's parole has been revoked. *See Noble I,* 887 F.Supp. at 13-14.

The Commission filed a timely notice of appeal from Judge Sporkin's order, and, on May 3, 1996, as noted earlier, the United States Court of Appeals certified to this court the controlling question of District of Columbia law. *See Noble II,* 317 U.S.App. D.C. at 305, 82 F.3d at 1109. After receiving comprehensive briefs and hearing oral argument—including a brief and argument from the District of Columbia as amicus curiae in support of Noble's position—we conclude that the district judge erred. The only basis for ruling that D.C.Code § 24-431(a) preserves a prisoner's "street time" as a credit against the sentence in the event parole is revoked is to say that § 24-431(a) impliedly

District of Columbia prisoner is released on parole from a federal facility, the parole is supervised by the United States Parole Commission in conformity with District of Columbia law. *See* D.C.Code §§ 24-206(b), -209 (1996 Repl.).

**3.** Parole for federal offenses has been abolished, *see* Comprehensive Crime Control Act of 1984, Pub.L. 98-473, tit. II, 98 Stat.1976, and thus 21 U.S.C. § 841(c) has been repealed. *See* Pub.L. 98-473, tit. II § 224(a)(2), (a)(6), 98 Stat.2030 (1984), as renumbered by Pub.L. 99-570, Tit. I § 1005(a)(2), 100 Stat. 3207-6 (1986). Section 841(c) continues to apply, however, to offenses committed before November 1987. *See* Sentenc-

ing Reform Amendments Act of 1985, Pub.L. 99-217, § 4, 99 Stat. 1728; *see also Gozlon-Peretz v. United States,* 498 U.S. 395, 399-400, 111 S.Ct. 840, 843-44, 112 L.Ed.2d 919 (1991).

**4.** This "dirty" urine was not Noble's only violation of the conditions of his parole. On January 29, 1992, according to the Commission's brief, a parole warrant had been issued against Noble as a result of his repeated use of unlawful drugs and of his failure to keep scheduled appointments. Noble, however, was placed in the Commission's "Sanction Center Program" as an alternative to revocation of his parole.

repealed D.C.Code § 24–206(a), which expressly provides to the contrary. We do not believe that Noble and the District have made the case for implied repeal.

## II.

### A.

The two statutes at issue, enacted fifty-five years apart,[5] arguably have inconsistent provisions. The more recent one, D.C.Code § 24–431(a), provides that *"[e]very person"* shall be given credit toward service of required imprisonment "for time spent in custody *or on parole."* (Emphasis added.) The older statute, D.C.Code § 24–206(a), provides that if parole is revoked, the *"time a prisoner was on parole shall not be taken into account* to diminish the time for which he [or she] was sentenced." (Emphasis added.) We therefore must construe the statutes, initially, as though the different legislatures enacted them together:

> The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts *in pari materia* are to be taken together, as if they were one law.

*United States v. Freeman,* 44 U.S. (3 How.) 556, 564–65, 11 L.Ed. 724 (1845) (citation omitted); *accord Holt v. United States,* 565 A.2d 970, 975 (D.C.1989) (noting that statutory provisions having same purpose or subject matter are in pari materia and should be construed together).

In construing § 24–206(a) and § 24–431(a) together, we must keep in mind that "[r]epeals by implication are not favored." *Luck v. District of Columbia,* 617 A.2d 509, 514 (D.C.1992). "When there are two acts upon the same subject, the rule is to give effect to both if possible." *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). Indeed, "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification

for a repeal by implication is [that] the earlier and later statutes are irreconcilable." *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *accord Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936) (noting that "where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one"); *Speyer v. Barry,* 588 A.2d 1147, 1163 (D.C. 1991) (noting that "courts choose the specific statute over the general one only if the two cannot be harmonized, and not otherwise").

More specifically, in evaluating whether there has been an implied repeal, we must determine whether " 'the intention of the legislature to repeal [is] clear and manifest.' " *Speyer,* 588 A.2d at 1165 (quoting *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982)) (emphasis removed). "[W]hen two statutes are *capable* of co-existence it is the duty of the courts, absent a clearly expressed [legislative] intention to the contrary, to regard each as effective." *Morton,* 417 U.S. at 551, 94 S.Ct. at 2483 (emphasis added). Under our case law, therefore, the burden lies on Noble and the District to show that the two statutes—§ 24–431(a) and § 24–206(a)— " 'are irreconcilable, clearly repugnant as to vital matters to which they relate, and so inconsistent that the two cannot have concurrent operation.' " *Speyer,* 588 A.2d at 1165 (quoting *Cedarbrook Realty, Inc., v. Nahill,* 484 Pa. 441, 399 A.2d 374, 383 (1979)).

In order to discern whether there is an "affirmative showing of an intention to repeal" or some other basis for finding an "irreconcilable" conflict that dictates an implied repeal, *Morton,* 417 U.S. at 549, 94 S.Ct. at 2482, we look first, of course, at the "plain language" or "plain meaning" of the combined statutes. *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753–54 (D.C.1983) (en banc). Here, however, the language itself is ambiguous. Taken together the provisions could mean, for exam-

---

**5.** *See* An Act to Establish a Board of Indeterminate Sentence and Parole for the District of Columbia, 47 Stat. 698, ch. 492, § 6 (July 15, 1932) (codified as amended at D.C.Code § 24–206(a) (1996 Repl.)); District of Columbia Good Time Credits Act of 1986, D.C. Law 6–218, § 5 (April 11, 1987) (codified at D.C.Code § 24–431(a) (1996 Repl.)).

ple, that as a general rule time on parole, like time in prison, counts toward service of a sentence, but that when parole is revoked, the accrued time spent on parole is revoked as well. Alternatively, the more recent language—"[e]very person" shall receive credit for time spent "on parole"—could be construed to mean exactly that, without exception for parole revocation cases. This interpretation, unlike the first one, would create an irreconcilable conflict with the earlier revocation language and thus implicitly would repeal the § 24–206(a) exception.

■ Although § 24–431(a) perhaps can be construed, reasonably, as a general rule for which the more specific language of § 24–206(a) provides a special exception for parole revocation cases—and although the two statutes, therefore, arguably can coexist in harmony—we cannot simply say that this plausible reading of the two statutes necessarily evidences the absence of an irreconcilable conflict that precludes repeal by implication. We have said that every provision of a statute "should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." *Veney v. United States,* 681 A.2d 428, 433 (D.C.1996) (en banc) (internal quotation marks omitted). Arguing in support of the trial court's ruling, Noble and the District (as amicus curiae) stress that unless the § 24–431(a) reference to credit for time spent "on parole" includes credit for street time after parole is revoked, the "or on parole" language in § 24–431(a) will be essentially meaningless. They say that anyone who completes a prison term without a parole revocation obviously gets the automatic benefit of all time spent "on parole." Thus, say Noble and the District, there would be no reason to enact such a truism unless the language was intended to mean something more; i.e., intended to apply for the prisoner's benefit in the only situation where a question would arise, namely, a case of parole revocation where a meaningful issue of "credit" under a "Good Time Credits Act" is presented. *See Beaty v. Ridley,* No. SP 138–93, slip op. at 4–5 (D.C.Super.Ct. Jan. 26, 1993) (Alprin, J.).

Noble's and the District's argument is convincing enough that, in the absence of conclu-

sive statutory language, we must look for help on the question of implied repeal in the legislative history of the Good Time Credits Act. *See Peoples Drug Stores,* 470 A.2d at 754. Specifically, we must inquire whether (1) the Council enacted merely a general rule in § 24–431(a)—i.e., a sentence is credited with "time spent in custody or on parole"— subject to the more specific, earlier limitation of § 24–206(a), or (2) instead adopted a provision intended to grant credit for all street time, even after parole has been revoked, resulting in an implied repeal of § 24–206(a).

**B.**

Until adoption of the Good Time Credits Act of 1986, there was no District of Columbia statute expressly authorizing credit against the sentence for time served in prison. *See* Memorandum from Margaret L. Hines, Deputy Corporation Counsel, to Walter B. Ridley, Acting Deputy Director for Operations, Department of Corrections, April 23, 1987, ¶ 6, at 3. Instead, the D.C. Department of Corrections, as a matter of custom, apparently followed federal law.

Before 1960, federal law required a prisoner's release "at the expiration of his term of sentence less the time deducted for good conduct." 18 U.S.C. § 4163 (1958). Federal law, however, did not credit a prisoner with jail time already served in connection with the offense before the prisoner was delivered to prison to begin serving the sentence. *See* Pub.L. 80–772, 62 Stat. 838 (June 25, 1948) (codified at 18 U.S.C. § 3568 (1958)). In 1960, that inequity was remedied; the law was amended to grant credit for custody imposed "for want of bail" before sentencing where "imposition of a mandatory minimum sentence" was required. 18 U.S.C. § 3568 (1964); *see* H.Rep. No. 86–2058 (1960), *reprinted in* 1960 U.S.C.A.N. 3288–90. Six years later, the Bail Reform Act of 1966 amended the statute again to assure, among other things, that the prisoner would receive credit for time spent in state custody for a charge ultimately prosecuted as a federal offense. *See* H.Rep. No. 89–154 (1966), *reprinted in* 1966 U.S.C.A.N. 2306. As amended at that time, 18 U.S.C. § 3568 provided (until repealed and replaced in 1986):

The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. The Attorney General shall give any such person *credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed.*[6]

(Emphasis added.) Over the years, therefore, federal law expressly has provided for a prisoner's discharge upon completion of the sentence, including credit for all time in custody, before and after sentencing, on account of the offense. District of Columbia law, however, was silent on these matters.

Although the D.C. Department of Corrections apparently has given credit toward service of a sentence for "any days spent in custody," *id.*, as in the federal system under § 3568, such credit for "custody" has included not only credit for incarceration before and after sentencing but also credit for time served on parole. Credit for "custody," therefore, has been construed broadly to mean "legal custody" as a way of embracing parole. Specifically, D.C.Code § 24–204(a) (1996 Repl.), traceable to the 1932 Act establishing the District's parole system, provides:

(a) Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board may authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe. *While on parole, a prison-*

*er shall remain in the legal custody and under the control of the Attorney General of the United States or his authorized representative until the expiration of the maximum of the term or terms specified in his sentence* without regard to good time allowance.

D.C.Code § 24–204(a) (emphasis added). This provision not only specifies that a prisoner on parole is still in "custody" but also intimates that time served on parole is credited toward "expiration" of the sentence, at least if the prisoner is "on parole" at the time the sentence expires.[7]

In the District of Columbia, therefore, time spent on parole apparently could be credited toward the sentence in either of two ways: simply by recognizing, through § 24–204(a), that parole legally was "custody" that could be expressly "credit[ed] toward service of [the] sentence" by reference to 18 U.S.C. § 3568; or, less directly, by inferring from § 24–204(a) itself that the government's right to custody of a prisoner lapsed upon expiration of the sentence while the prisoner was on parole. This latter inference, however, could not be used to create credit on the sentence if parole had been revoked, because any such credit is tied to the prisoner's remaining "on parole ... until the expiration" of the sentence. *Id.*

Despite these avenues for crediting time on parole toward service of the sentence, it has been clear from the beginning that whatever credit a District of Columbia prisoner received, as a general rule, for time served on parole, a revocation of parole created an exception. In case of revocation, § 6(a) of the 1932 Act, see *supra* note 5—now incorporated in D.C.Code § 24–206(a)—required au-

---

**6.** Bail Reform Act of 1966, 18 U.S.C. § 3568 (1985), *repealed by* Pub.L. 98–473, tit. II, ch. II, 98 Stat.1987 (1984) (effective Nov. 1, 1987) (providing "credit for prior custody" in 18 U.S.C. § 3585(b) (1994)).

By 1971, it was clear that failure to grant a prisoner credit for time served because the prisoner could not afford to post bail could result in a court order granting such credit on equal protection grounds. *See United States v. Gaines,* 449 F.2d 143, 144 (2d.Cir. 1971) (citing *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130

(1971); *Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)).

**7.** Federal law similarly included "parole" within the meaning of "legal custody" and implied that parole was credited toward "expiration" of the sentence—until federal parole was abolished in 1986. 18 U.S.C. § 4210(a) (1982); 18 U.S.C. § 4203 (1964); *see* Pub.L. 98–473, tit. II, ch. II, 98 Stat.2027, 2031 (1984) (effective Nov. 1, 1987) (abolishing federal parole, 18 U.S.C. §§ 4201 to 4218).

tomatic withdrawal of all credit previously awarded for parole:

> If the order of parole shall be revoked, the prisoner, unless subsequently reparoled, shall serve the remainder of the sentence originally imposed less any commutation for good conduct which may be earned by him after his return to custody. For the purpose of computing commutation for good conduct, the remainder of the sentence originally imposed shall be considered as a new sentence. *The time a prisoner was on parole shall not be taken into account to diminish the time for which he was sentenced.*

D.C.Code § 24–206(a) (emphasis added).[8] Until enactment of the statute at issue in this case, therefore, the law—both federal and local—has withdrawn credit toward the sentence for time spent on parole if that parole was ever revoked.

In sum, the pattern of federal law, reflected for the most part by District of Columbia law, has provided in three separate statutory provisions: (1) credit for "custody," including presentence custody attributable to the offense charged; (2) credit for time spent "while on parole" in the "legal custody" of the Attorney General until "expiration" of the sentence; and (3) withdrawal of credit for time on parole, if parole is revoked. The District lacked the first type of statute altogether and, in lieu thereof, simply followed federal practice. *See* 18 U.S.C. § 3568 (repealed). In the other two categories, the District had statutes similar to the federal ones.

### C.

This was the state of the law until 1987, when the Council for the District of Colum-bia replaced the 1901 law governing "deduction for good conduct," D.C.Code § 24–405 (1987 Supp.) (repealed)—which made no reference to parole—by enacting a comprehensive system of credits for time served on a criminal sentence. Initially in the bill for a Good Time Credits Act, the first subsection (a) the drafters proposed for what is now D.C.Code § 24–431 provided:

> (a) Every person shall be given credit on the maximum term and the minimum period of imprisonment for time spent *in custody* as a result of the offense for which the sentence was imposed. When entering the final order in any such case, the court shall provide that the person be given credit for the time spent.[9]

District of Columbia Good Time Credits Act of 1986, D.C. Bill No. 6–505, § 5(a) (1986) ("original Bill No. 6–505") (emphasis added). In the same bill, the drafters also included an entirely new provision that preserved "good time credits earned while on parole." *Id.* § 5(d). Specifically, this original subsection (d) provided:

> (d) In any case in which parole is revoked for violations of the conditions of parole and the person is recommitted to serve the remainder of the maximum term, the person *shall not forfeit good time credits earned while on parole.*

*Id.* (emphasis added). At a hearing on the bill, however, Hallem H. Williams, Deputy Director of the D.C. Department of Corrections, pointed out that this subsection (d) was meaningless because no one can earn "good time" credits while on parole; such credits, he said, can accrue (by definition) only while a person is incarcerated.[10]

---

**8.** Federal law also withdrew credit for street time upon revocation of parole. *See* 18 U.S.C. § 4205 (1964); *United States v. Newton,* 698 F.2d 770 (5th Cir.1983).

**9.** This first draft of D.C.Code § 24–431(a) was similar to 18 U.S.C. § 3568 (quoted *supra* in text accompanying note 6), which reflected the principle of credit toward sentence for time in custody on which the D.C. Department of Corrections previously had relied. Necessarily, it would have been read in conjunction with D.C.Code § 24–204(a), also quoted above, which confirmed that a prisoner on parole "shall remain in the legal custody ... of the Attorney General" until expiration of the sentence. Accordingly, this first draft subsection (a), in allowing credit for time spent "in custody," would have been broadly interpreted to grant credit toward service of the sentence for all time spent in "legal custody," meaning credit for time spent both in physical custody and on parole.

**10.** *See Good Time Credits, 1986: Hearing on Bill 6–505, "District of Columbia Good Time Credits Act of 1986" Before the Comm. on the Judiciary,* at 8 (1986) (statement of Hallem H. Williams, Deputy Director, District of Columbia Depart-

Apparently as a result of Mr. Williams' testimony, the original subsection (d)—quoted immediately above—was revised at a Judiciary Committee markup session and expanded into a new subsection (c) [11] in a new "markup" version of the bill:

> (c) When parole is revoked for violations of the conditions of parole and the person is recommitted to serve the remainder of the maximum term, the good time credit shall be computed on the basis of the original maximum sentence and the inmate *shall not forfeit good time credit previously earned on the current sentence.*

Judiciary Committee Markup, *supra* note 11, at 7 (emphasis added). This paragraph not only omitted the previous reference to "good time credits earned *while* on parole" but also failed to substitute a sentence crediting street time. Rather, in case of parole revocation, the revised, "markup" bill provided only for retention of "good time credit previously earned" while incarcerated.

Also at this time, the Judiciary Committee added to the new bill—without explanation—the revised subsection (a) we are now called upon to interpret:

> (a) Every person shall be given credit on the maximum term and the minimum period of imprisonment for time spent *in custody or on parole* as a result of the offense for which the sentence was imposed. When entering the final order in any case, the court shall provide that the person be given credit for the time spent *in custody or on parole* as a result of the offense for which sentence was imposed.

Judiciary Committee Markup, *supra* note 11, at 7 (emphasis added). These two sentences, therefore, arguably incorporated for the first time in a District statute the standard past practice—the general rule—of granting credit when an inmate completes the sentence comprised of physical custody followed by parole, without revocation of parole. More specifically, one might say that this revised, "markup" subsection (a) effectively combined the principle of 18 U.S.C. § 3568 (repealed) (every person shall receive "credit toward service of his sentence for any days spent in custody") with a portion of D.C.Code § 24–204(a) ("While on parole, a prisoner shall remain in the legal custody ... of the Attorney General."). Under this interpretation, therefore, the Council would have brought into one statute, for clarity and convenience, the general rule taken from two statutes previously applied to a prisoner in "custody": credit against the sentence for time served both in prison and on parole. Because this would have been the first time a District statute *expressly* gave credit on the sentence for time spent on parole (as well as in prison), this revised subsection (a) would not have been merely a reprise of the language in § 24–204(a) intimating the award of such credit for parole; it would have added greater clarity and certainty.

Alternatively, there is room for another, even more substantive—indeed, absolute—interpretation: that the Council added the words "or on parole" to indicate, albeit cryptically, that "[e]very person" who has been on parole, whether revoked or not, is entitled to credit for all street time served. This alter-

---

ment of Corrections) (hereinafter Williams Statement).

11. The original subsection (c), providing credit for street time while on "probation," was withdrawn at Mr. Williams' suggestion. *See* Williams Statement, *supra* note 10, at 8; Comm. on the Judiciary, D.C. Council 6–505, Amendment in the Nature of a Substitute, at 7 (D.C. Comm. Print 1986) (hereinafter Judiciary Committee Markup). Specifically, this former subsection (c) provided:

> (c) In any case in which probation is revoked, the time that the person has served under the probation shall be credited toward and considered a part of the time the person was originally sentenced to serve.

Original Bill No. 6–505, § 5(c). Mr. Williams urged rejection of this provision for two reasons. First, it would conflict with D.C.Code § 24–104, which provided that if probation is revoked, "the time of probation shall not be taken into account to diminish the time for which [the probationer] was originally sentenced"—a provision, we note, that is similar to § 24–206(a). Williams Statement, *supra* note 10, at 8. Second, according to Mr. Williams, the original subsection (c) "would tend to weaken the incentive of a probationer to observe the conditions of his probation, especially toward the end of the probationary period, as revocation at such time could mean a significantly shorter period of incarceration than the probation violator might otherwise be required to serve." *Id.*

native interpretation, urged by Noble and the District, is problematic.

At some point during the third legislative stage, between introduction of the Judiciary Committee markup and final passage of the bill, the Council eliminated the new "markup" subsection (c), which would have preserved "good time credit previously earned" *for a period of incarceration before a parole* revocation. *See* District of Columbia Good Time Credits Act of 1986, D.C.Law 6–218, 34 D.C.Reg. 479 (1987) (enrolled original). The legislative history supplies no reason why this was done, but this action appears to suggest a legislative attitude that, over time, had become less favorably disposed toward parole violators. This apparently hardening attitude also is reflected in the Council's failure to convert the original, technically incorrect subsection (d)—providing that a prisoner "shall not forfeit good time credits earned while on parole"—to language that unambiguously would preserve the idea by protecting "street time credits earned while on parole." [12]

The final version of the Good Time Credits Act included § 24–431(a) (credit for time spent "in custody or on parole")—the provision at issue here—without further change.[13] At this point in the legislative process, there-

fore, nothing drafted by the Council expressly erased or otherwise clearly removed the long-standing requirement of § 24–206(a). In light of the two major, presumably conscious omissions of provisions once in the bill—the Council's abandonment of accrued good time credits after a parole revocation, and its failure to preserve street time explicitly *after its intention to do so had been* manifest in the original bill—there is no clear basis for saying that the Council, merely by adding the words "or on parole" to the original version of subsection (a), all of a sudden, and without explanation, see *supra* note 13, intended to make substantive additions that not only explicitly granted credit for street time, as a general rule, but also implicitly repealed the longstanding § 24–206(a) ban on street time credit if parole is revoked.

Under the circumstances, therefore, it would appear that § 24–431(a) simply put together in one statutory provision the idea of repealed 18 U.S.C. § 3568 (days "spent in custody") and another from § 24–204(a) (while on parole, prisoner remains "in the legal custody" of the Attorney General). Whereas the term "custody" once had to be construed broadly enough—by reference to another statute—to mean legal custody, in-

12. The Commission, in its brief, argues that the new "markup" subsection (c) which the Council eventually eliminated would have directly conflicted with a part of D.C.Code § 24–206(a), not at issue here, which provides that when a parole violator is returned to prison "[f]or the purpose of computing commutation for good conduct, the remainder of the sentence originally imposed shall be considered as a new sentence." According to the Commission's brief, "subsection (c) would have increased the rate at which reincarcerated parolees earned good time credits, by calculating the credits (at a higher rate) on the basis of the sentence originally imposed by the court rather than on the basis of the balance of that sentence remaining at the time of revocation." The Commission, therefore, would have us infer that the Council, in withdrawing credit for good time previously earned by a parole violator, accordingly deferred to § 24–206(a) for such computation purposes and, thereby, recognized the continuing validity of § 24–206(a) for all purposes.

The Commission also notes that the Good Time Credits Act, as finally adopted, expressly repealed D.C.Code § 24–405, the statute permitting "deduction for good conduct" then on the books. *See* District of Columbia Good Time Credits Act

of 1986, D.C. Act 6–253, Jan. 8, 1987, at 6. The Commission then argues that this shows the Council knew how to repeal a related section of the D.C.Code, that it did not expressly repeal D.C.Code § 24–206(a), and that we accordingly should infer that the Council intended to leave § 24–206(a) fully operable as is.

These arguments are intriguing but not necessary to our analysis.

13. In the November 12, 1986 report of the Committee on the Judiciary to the Council on Bill 6–505, as marked up for final Council discussion, the reference to "Section 6" (section 5 as passed by the Council) was, in full:

> Requests that a person be given credit for time spent in custody pending trial and time spent on parole. *Additionally, if parole is revoked, good time credits are to be computed on the basis of the original maximum sentence.*

(Emphasis added.) Despite efforts by each party to use the italicized language to advantage, the Committee language adds nothing to resolution of the issue before us—except, perhaps, to reflect the drafters' silence, and thus apparent indifference, as to the implied repeal issue now before us.

cluding parole, the language of § 24–431(a) appears to reflect the Council's recognition that this two-statute analysis was awkward and unnecessary, and thus reflects a legislative decision to return "custody" to its more traditional, lay meaning: physical custody. As a result, a prisoner now, for the first time under District law—and in the same statute—expressly gets credit toward the sentence for time served either "in [physical] custody or on parole." In short, the credit for *legal* "custody" implicitly referred to in 18 U.S.C. § 3568 (repealed)—and in the original draft of subsection (a), see *supra* text accompanying note 9—is now broken down into understandable components in § 24–431(a): physical custody and parole.

As indicated earlier, Noble's and the District's argument that § 24–431(a) impliedly repealed § 24–206(a)'s ban on credit for parole after revocation is premised largely on the belief that the words "or on parole" in § 24–431(a) would be meaningless unless interpreted to extend credit for street time even upon revocation; otherwise, they say, there would be no reason to enact a mere truism—credit for time spent on unrevoked parole—which can be inferred from § 24–204(a).[14]

We disagree with this argument for two reasons. First, although District law, *see* D.C.Code § 24–204(a), has intimated that time spent on parole is to be credited toward completion of the sentence when the prisoner is on parole at the time the sentence expires, that intimation is not an express award of credit; there was reason to be much clearer in affirmatively granting credit for parole time than § 24–204(a) itself reflected. Second, it was reasonable to locate credit for time served in physical custody and on parole, respectively, in the same statutory provision; because the District itself lacked a statute granting credit toward the sentence for time in custody, there was reason to enact such a statute and to include in it, for clarity and convenience, a more direct, and

thus much-improved, expression of credit for time served on parole. The § 24–431(a) references to "parole," therefore, cannot be called meaningless or redundant.

This is not to say that Noble's and the District's argument altogether lacks force; to some extent our interpretation of "or on parole" in § 24–431(a) reflects the message already found in § 24–204(a): credit for time while on parole until expiration of the sentence. We have indicated, however, that there are at least two sound reasons why the Council may have wanted to package express credit for time spent in prison and on parole in the same statute, rather than keeping them separate, subject to the vagueness of § 24–204(a). These reasons are more than enough to defeat (or at the very least neutralize) the argument that, to avoid "meaninglessness" or redundancy, § 24–431(a) *must* have been intended to repeal § 24–206(a), the statute barring credit for street time when parole has been revoked.

It is, of course, possible, despite sound reasons why the "parole" language of § 24–431(c) is not redundant, that the Council believed the addition of "or on parole" to subsection (a) would be enough to restore the general idea expressed in the earliest (withdrawn) subsection (d), i.e., that parole revocation would "not forfeit good time credits earned while on parole"—meaning, really, not technical "good time credits" but "street time." But this is pure speculation. That idea had been altogether abandoned in the revised, "markup" subsection (c) and replaced by preservation of "good time credit previously earned" while in physical custody, not credit for time served on parole. And then, even this revised subsection (c) was withdrawn. If the Council was unwilling to credit good time earned during incarceration before a parole revocation, it is not likely that the Council intended, nonetheless, to preserve street time before a parole revocation merely by use of an ambiguous, three-word phrase. Nothing, therefore, in the leg-

14. If one relies on § 24–204(a) as a basis for awarding credit for time on parole—in contrast with relying on § 24–204(a) merely to enlarge the meaning of "custody" to include parole within the meaning of § 3568—Noble's argument that § 24–431(a) impliedly repealed § 24–206(a)

would also necessitate an implied repeal of § 24–204(a) to the extent it limits credit for time spent on parole to cases of unrevoked parole. Noble and the District, however, do not address that issue.

islative history as it unfolded gives a discernible indication that the Council, while as a general rule granting credit for time spent on parole, intended to change the principle—long imbedded in both federal and local law—that a prisoner loses credit toward the sentence for time on parole if parole is revoked.

In sum, although use of the words "in custody or on parole" in § 24–431(a) could have two meanings—one a clarification of the credit for "custody" principle in 18 U.S.C. § 3568, see *supra* note 9, the other a substantive repeal of § 24–206(a)—the legislative history of the Good Time Credits Act reflects no "irreconcilable" conflict between § 24–431(a) and § 24–206(a), let alone an "affirmative showing of an intention to repeal" § 24–206(a), *Morton,* 417 U.S. at 549, 94 S.Ct. at 2482, such that "the two cannot have concurrent operation." *Speyer,* 588 A.2d at 1165 (internal quotation marks omitted). The possible, absolute meaning of "or on parole"—including credit for street time after parole revocation—is not clearly enough indicated to supplant an interpretation that harmonizes the two provisions, one of general application, the other a specified exception. *See id.* Accordingly, the statutory language and legislative history, taken together, are enough—without more—to show that the very strict test for implied repeal is not met.

### III.

◼ This legislative history analysis does not end the matter, however. Noble and the District tell us that whatever interpretation we independently may glean from the language of § 24–431(a) and its legislative history, that interpretation should be tentative at best because it has not been informed by critical voices to whom we owe some deference: the Corporation Counsel and the executive officials from the Department of Corrections who administer the Good Time Credits Act, all of whom hold a different view. Furthermore, we are told, this court

itself accorded deference to Department officials while interpreting § 24–431(a) in an earlier opinion, *Luck,* and thus we are bound by our previous analysis that would lead to sustaining the trial court here in Noble's (and the District's) favor. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) ("As a matter of internal policy, we have adopted the rule that no division of this court will overrule a prior decision of this court ... and that such result can only be accomplished by this court en banc." (footnote omitted)).

### A.

In *Luck,* this court answered a question certified by the United States Court of Appeals for the District of Columbia Circuit, concluding that the District of Columbia Parole Board and the District of Columbia Department of Corrections

> properly interpret[ed] section 24–431(a) of the Code of the District of Columbia in deciding that time spent on parole prior to April 11, 1987, cannot be credited against a person's sentence when that person's sentence is recomputed after April 11, 1987.

617 A.2d at 510 (internal quotation marks omitted). As in this case, *Luck* concerned computation of credits, if any, against Luck's prison sentence—after a parole revocation—for time spent on parole. But the only issue presented concerned credit, if any, for the parole period before the effective date of the Act. We accepted the District's argument, construing §§ 24–431(a) and 24–206(a) together, that § 24–206(a) precluded credit for street time which had accrued before April 11, 1987. In other words, we declined to find an implied repeal of § 24–206(a) that awarded credit for street time retroactively. Every party to the case, as well as the court, assumed that § 24–431(a) permitted street time credit after the Act's effective date, based on the statute's plain language. *Luck,* 617 A.2d at 511 (noting in dictum that "the Act provided for the first time that prisoners would receive credit for time which they successfully spent on parole").[15] We did not

---

15. *See also Franklin v. Ridley,* 635 A.2d 356, 358 (D.C.1993) (holding that after revocation of probation, prisoners not entitled to credit toward sentence for time spent on probation, in contrast with time spent on parole, for which, the court assumed in dictum, the D.C.Code "clearly provides ... prisoner may receive credit").

address that question, however, and, in rejecting an implied retroactive repeal of § 24–206(a), we made clear our view that implied repeals "are not favored" and thus are found "only in exceptional cases." *Id.* at 515.

Although retroactivity was the only concern in *Luck,* we discussed in our decision not only the legislative history indicating that the Council intended no retroactive application, *see id.* at 512, 514–15, but also the principle of deference that Noble advocates here: the " 'great weight' " this court accords "to any reasonable interpretation of a statute by the agency charged with its administration." *Id.* at 515. Quoting earlier decisions, we said the rationale for extending such deference

> is particularly true where, as here, we have a contemporaneous construction of a statute by the [agency] charged with the responsibility of setting its machinery in motion and making the parts work efficiently and smoothly while they are yet untried and new.

*Id.* (internal quotation marks omitted) (alteration in original). Especially because, in *Luck,* we invoked such deference in sustaining a Department of Corrections interpretation of § 24–431(a)—the very provision at issue here—Noble and the District say we are duty-bound to do the same now.

In this case, the deference question is presented with respect not only to the Department of Corrections but also to the Corporation Counsel, since the Department drew upon the opinion of that office in taking the position pressed by Noble and the District. Accordingly, both of these executive branch opinions require detailed examination before we can decide their impact, if any.

**B.**

Within days after the Good Time Credit Act's effective date, the Department of Corrections sought the views of the Deputy Corporation Counsel, Margaret L. Hines, as to whether subsection 5(a), later codified as D.C.Code § 24–431(a), was "inconsistent with D.C.Code § 24–206 (1981)." On April 23, 1987, in a memorandum to Walter B. Ridley, Acting Deputy Director for Operations, Department of Corrections, Ms. Hines an-

swered, "Yes. Section 5(a) of the Act gives the recommitted parole violator credit on the maximum term equal to the time served on parole. . . ." Ms. Hines added her own belief that "[t]he apparent reason for the bill's failure expressly to repeal the inconsistent language of D.C.Code § 24–206 (1981) was that *no one discovered the inconsistency. . . .*" In this way, Ms. Hines expressed her view that, had the Council noticed the inconsistency, it would have expressly repealed the § 24–206(a) ban on street time credit after a parole revocation.

On May 22, 1987, the Department of Corrections, adopting the position suggested by the Hines memorandum—implied repeal of § 24–206(a)—issued Department Order No. 4340.2 (1987) (quoted in *Luck,* 617 A.2d at 512):

> Every resident returned to custody as a parole violator shall be given credit for time spent on parole after 11 April 1987 until the time that the parole violation warrant is executed.

On February 19, 1988, the Department of Corrections issued that interpretation as a formal regulation, 35 D.C.Reg. 1077, 1078 (1988) (to be codified at 28 DCMR § 601.7):

> Revocation of parole shall not result in a loss of credit, for the time spent on parole, toward service of the sentence on which parole was granted.

No one disputes that, as a result of the Department Order and regulation, over the years since the Act became effective the Board of Parole has granted credit on prisoners' sentences, after revocation of parole, for street time earned before revocation.

In the meantime, on September 16, 1987, Patrick S. Glynn, General Counsel of the United States Parole Commission, wrote Frederick D. Cooke, Jr., the District's Corporation Counsel, expressing disagreement with the Hines memorandum.

> In brief, I believe that the applicable principle of law in this instance is that a specific statute must always take precedence over a statute of general applicability, regardless of priority of enactment. . . . I believe that the specific provision of § 24–206(a), that time on parole does not

diminish a prisoner's sentence if parole is revoked, should be given precedence over the general credit for parole time contained in the new § 24–431(a).

I also believe that the Councilmembers could not have intended to benefit a category of offenders that includes many of our most dangerous recidivists; such a result seems at odds with their reported intent to reduce prison population without jeopardizing the public welfare.

On October 30, 1987, Mr. Cooke replied, supporting the Hines/Department of Corrections interpretation. He noted that "one of the principal purposes of the act was to relieve prison overcrowding by *shortening* the length of both maximum and minimum sentences through the use of credits." He then referred to the original (but withdrawn) language in subsection (d) that a prisoner "shall not forfeit good time credits earned while on parole"; he opined that, "in place of the above-quoted language," the Council had inserted the present language ("or on parole") to accomplish the "unmistakable general intent ... that, even where parole is revoked, the time served on parole should to some extent be credited against the remainder of the maximum of the sentence"; and he concluded that any other interpretation of the words "or on parole" would "render the phrase superfluous." [16]

### C.

After reviewing the foregoing interpretations and applicable case law, we conclude that we should not defer here to the Department of Corrections' views. In the first place, to address a technical matter, *Luck* does not bind us to do so. There, we accorded "great weight" to the Department's interpretation merely to buttress a conclusion we already had reached based on statutory language, legislative history, and applicable canons of statutory construction. *See Luck,* 617 A.2d at 512–15. Although, at the end, we referred to "the legislative history and ad-

ministrative construction" as factors in our calculus, *id.* at 515, we believe a fair reading of our opinion reveals the use of administrative construction as corroboration of, rather than as an indispensable contribution to, the analysis.

But even if one were to read *Luck* as depending, in some small way, on administrative construction—perhaps in discussion of the rule on lenity, *see id.*—the idea of deference reflected in *Luck* is not a requirement of absolute obeisance; as elaborated below, it is a matter of taking into account agency views which the court, as final decision-maker, has authority—indeed, sometimes an obligation—to reject. In short, *Luck* does not bind us, unreservedly, to adopt the Department of Corrections construction of § 24–431(a).

Second, given the particular issue in *Luck*—retroactive/nonretroactive application of a statute—where the administrative interpretation agreed with quite clear legislative history, *see Luck,* 617 A.2d at 511–12, 514–15, there was no reason to question whether deference to the administrators was appropriate; we simply recited the traditional words of deference without need for scrutiny. In this case, however, there is considerable tension between many aspects of the legislative history and the administrators' construction of the statute involved, complicated by this court's obligation, as the final arbiter, to harmonize two statutes unless they are "irreconcilable." *Morton,* 417 U.S. at 549, 94 S.Ct. at 2482. In contrast with *Luck,* therefore, we are compelled to consider exactly when deference should—and should not—be accorded.

Finally, we defer to agency construction of statutes because of the agency's presumed expertise in construing the statute it administers. But such deference presupposes that some expertise beyond the court's own is needed. In some instances, the legislature has delegated authority to the agency to fill

16. This last point reflected Mr. Cooke's belief that, in adopting § 24–431(a), the Council would not have enacted a mere truism—i.e., that every person receives credit on a term of imprisonment for time spent "in custody or on parole"—since the word "custody" alone includes parole for

that purpose by virtue of D.C.Code § 24–204(a) (while on parole prisoner remains in "legal custody" of Attorney General). *See* Letter of October 30, 1987 from Frederick D. Cooke, Jr. to Patrick S. Glynn.

in gaps or ambiguities, involving policy choices, that the statute itself has not expressly covered, and that the courts are not necessarily in a superior, or even an equal, position to make an informed decision about. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). We therefore have deferred to the Department of Employment Services, for example, when confronted by reasonable, alternative interpretations of the workers' and unemployment compensation statutes;[17] to the Office of Human Rights when presented with different possible interpretations of the Human Rights Act;[18] and to the Department of Human Services when faced with varying understandings of federal welfare regulations.[19]

In other instances, "deference is appropriately generous under the rule of administrative law where there is a technical matter within the special competence of the official or agency." Harold Leventhal, *Environ-*

*mental Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509, 523 (1974). As the Supreme Court explained in *Chevron,* such deference is particularly due when "a full understanding of the force of the statutory policy in the given situation [depends] upon more than ordinary knowledge respecting the matters subjected to agency regulations," 467 U.S. at 844, 104 S.Ct. at 2782–83 (internal quotation marks omitted), and "the regulatory scheme is technical and complex," *id.* at 865, 104 S.Ct. at 2793. For example, we have deferred to rental housing regulators for statutory interpretations when complicated questions involving computation of the allowable rate of return have been presented;[20] to the Department of Finance and Revenue in ascertaining the nature of property for tax purposes;[21] and to the Public Service Commission on ratemaking and related issues.[22]

Even in honoring the deference principle, however, we have rejected agency interpreta-

---

**17.** *See, e.g., Hughes v. District of Columbia Dep't of Employment Servs.,* 498 A.2d 567, 570 (D.C. 1985) (deferring to Director's interpretation of statutory language in Workers Compensation Act limiting compensation to claimants whose employment was "principally localized in the District of Columbia"); *Hockaday v. District of Columbia Dep't of Employment Servs.,* 443 A.2d 8, 12 (D.C.1982) (deferring to Director's interpretation of unemployment compensation statute in holding that employee who leaves job for health reasons does not have required "good cause connected with the work" in absence of documented medical advice to leave work).

**18.** *See, e.g., Timus v. District of Columbia Dep't of Human Rights,* 633 A.2d 751, 758–760 (D.C. 1993) (en banc) (deferring to agency interpretation of statutory phrase "failure of conciliation efforts" as meaning conciliation efforts have failed only when respondent, but not when complainant, has refused to participate in conciliation efforts or has offered inadequate settlement).

**19.** *See, e.g., Boyd v. District of Columbia Dep't of Human Servs.,* 524 A.2d 744, 747 (D.C.1987) (per curiam) (deferring to agency's interpretation of recoupment procedures for overpayments of welfare benefits).

**20.** *See, e.g., 1880 Columbia Rd., N.W., Tenants' Ass'n v. District of Columbia Rental Accommodations Comm'n,* 400 A.2d 333, 336–37 (D.C.App. 1979) (deferring to Commission's adoption, in "absence of legislative guidance," of "formulae for computing rate of return and cash flow [that]

include depreciation as an expense in both calculations"); *Tenants of 3039 Q Street, N.W. v. District of Columbia Rental Accommodations Comm'n,* 391 A.2d 785, 787 (D.C.1978) (deferring to Commission's allowance of two percent of assessed value of building and site in addition to full depreciation for tax purposes, when reviewing landlord's proposed rent increase).

**21.** *See, e.g., District of Columbia v. Casino Assocs., Ltd.,* 684 A.2d 322, 325 (D.C.1996) (deferring to Department on meaning of word "void" in statute governing assessments and reassessments of property taxes); *District of Columbia v. Willard Assocs.,* 655 A.2d 1237, 1241 (D.C.1995) (deferring to Department's determination of what constitutes "mixed use" property and whether Mayor may condition determination on submission of necessary information by taxpayer); *Donahue v. District of Columbia,* 451 A.2d 85, 87 (D.C.1982) (deferring to Department's method of distinguishing between personal property and fixtures for purposes of property tax).

**22.** *See, e.g., Watergate East, Inc. v. District of Columbia Pub. Serv. Comm'n,* 662 A.2d 881, 886–87 (D.C.1995) (deferring to Public Service Commission's determination of hot and cold water rates); *cf. Jordan v. Pub. Serv. Comm'n,* 622 A.2d 1106, 1110 (D.C.1993) (noting that weight given to "Commission's legal determinations is at its zenith when the inquiry relates to arcane questions regarding proposed rate increases," but not in interpretation of federal Small Business Act for which it has no expertise).

tions that, in our judgment, contravened plain statutory language or clear legislative history. In such situations, we have not hesitated to reverse even when the agency has special expertise that would usually cause us to defer.[23]

Nor will this court defer to agency opinion when the issue is purely one of law not involving an agency's attention to gaps or ambiguities in the statute it administers or to technical applications.[24] In this case, the ruling will not require the use of expertise in corrections administration. The issue of implied repeal is purely one of law; there is no room for deference to non-judicial opinion.

It might be different if, for example, the statute contained the original subsection (d), providing that a prisoner "shall not forfeit good time credits earned while on parole." A court might accept a prison administrator's expert advice that good time credits, by definition, cannot be earned on parole and that the Council, therefore, must have meant street time credits. But no such issue of interpretation is presented here, and thus there is no basis for deferring to an executive department's conclusion about an issue of implied repeal—a legal issue of the sort that judges, not administrators, decide.[25] Indeed, this conclusion is reinforced by the fact that the Department of Corrections apparently relied for its analysis exclusively on the Hines memorandum from the Corporation Counsel's office—a reliance that is entirely appropriate but reveals the absence of any expert input by the Department itself. Even the Department, therefore, appeared to recognize that the question presented was entirely a legal question that did not require expert agency insight.

In sum, we conclude that *Luck* does not bind us to defer to Department of Corrections interpretation of § 24–431(a). But even if, by virtue of *Luck,* we were required to accord the Department's views the kind of deference ordinarily due a government agency for interpretation of statutes it administers, we would conclude that the statutory

---

**23.** In housing regulation: *see, e.g., James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 48–49 (D.C.1989) (rejecting Commission's interpretation of statutory provision relating to hardship increases in rent where incompatible with statute's plain language); *DeLevay v. District of Columbia Rental Accommodations Comm'n,* 411 A.2d 354, 359 (D.C.1980) (rejecting Commission's interpretation of statutory phrase "aggrieved party"); in tax matters: *see, e.g., District of Columbia v. Catholic Univ.,* 397 A.2d 915, 919 (D.C.1979) (rejecting Department's refusal to allow tax exempt status for unoccupied property of nonprofit university despite broad mandate to administer revised tax law, since "it is axiomatic that a regulation be consistent with the statute under which it was promulgated"); in consumer regulation: *Office of People's Counsel v. Public Serv. Comm'n,* 520 A.2d 677, 685 (D.C.1987) (reversing Commission's order allowing taxicab holding company to establish sinking fund in lieu of insurance, where "[e]ven under a very broad reading of the statutory scheme, this result could not reasonably have been contemplated by Congress"). *See generally Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

**24.** *See, e.g., Jordan,* 622 A.2d at 1110 (declining to defer to Public Service Commission's interpretation of federal Small Business Act); *Cafritz Co.*

*v. District of Columbia Rental Hous. Comm'n,* 615 A.2d 222, 228 (D.C.1992) (rejecting Commission's interpretation of this court's opinions since "[w]e owe no deference ... to the Commission's interpretation of cases decided by courts"); *District of Columbia Metro. Police Dep't v. Broadus,* 560 A.2d 501, 504 (D.C.App.1989) (declining to defer to Office of Employee Appeals where decision rests on interpreting nature of criminal indictment to determine whether indictment is "sufficient evidentiary basis to support cause for suspension without pay under [the relevant statute]"); *Embassy of the People's Republic of Benin v. District of Columbia Bd. of Zoning Adjustment,* 534 A.2d 310, 314 (D.C.1987) (declining to defer to Board in resolving conflict of jurisdiction between Board and procedures under federal Foreign Missions Act); *Office of People's Counsel,* 520 A.2d at 681 (declining to defer to Commission's interpretation of statute where appeal "presents only an issue of statutory construction, a clear question of law, as to which our scope of review is not so narrowly confined"); *Saah v. District of Columbia Bd. of Zoning Adjustment,* 433 A.2d 1114, 1116 (D.C.1981) (declining to follow agency's application of estoppel and noting that "where the agency's final decision rests on a question of law, the reviewing court has the greater expertise, and the agency decision is therefore accorded less deference").

**25.** We therefore reject the argument that the views of appellant, the United States Parole Commission, should also receive deference.

language and relevant legislative history do not permit deference to Department views in this particular case, especially where the virtual presumption against implied repeal places an obligation on the court to reconcile the conflicting statutes if reasonably possible.

### D.

■ We turn, accordingly, to the Corporation Counsel's role. Noble and the District stress that Corporation Counsel Cooke, six months after the effective date of the Good Time Credits Act, opined that § 24–431(a) implicitly repealed § 24–206(a), and that we owe this view deference even if we reject the Department of Corrections' regulation.

For years under the District of Columbia Code, the Corporation Counsel has been required to "furnish opinions in writing to the Mayor" (or, formerly, to the Commissioner) "whenever requested to do so." D.C.Code § 1–361 (1992 Repl.); *see* D.C.Code § 1–301 (1973). Specifically, "[a]ll requests for opinions shall be transmitted through the Mayor, and a record thereof kept, with the opinions, in the Office of the Executive Secretary of the Mayor" (formerly the office of the secretary of the Commissioner). D.C.Code § 1–361 (1992 Repl.); *see* D.C.Code § 1–301 (1973).

We shall assume, for purposes of analysis, that Mr. Cooke's letter of October 30, 1997 to Patrick S. Glynn, Esq., General Counsel of the United States Parole Commission, is a formal opinion of the Corporation Counsel of the sort authorized in D.C.Code § 1–361. Arguably, however, it does not have the status of a formal opinion. According to Office Order No.: 82–11 of the Office of the Corporation Counsel concerning "Preparation of Opinions of the Corporation Counsel and Memoranda of Legal Advice" (September 3, 1982) (Office Order No.: 82–11), at 1, 2:

The term "opinion" ... properly refers only to those formal legal interpretations

signed by the Corporation Counsel which are intended to serve as the guiding statement of law for District Government officers and employees in the performance of their official duties, as provided by Part II of Reorganization Order No. 50 (June 26, 1953), D.C.Code, tit. 1 App. at 180 (1973).

. . . .

With respect to documents hereinafter prepared, only the following shall constitute an Opinion of the Corporation Counsel: *a letter ... which is entitled, under the date, "Opinion of the Corporation Counsel" and signed by the Corporation Counsel.* The letter shall be addressed to the government official requesting our guidance.

(Emphasis added.) Corporation Counsel Cooke's letter of October 30, 1987 to Mr. Glynn was not requested by or directed to a District of Columbia officer or employee. More importantly, although signed, it was not entitled an "Opinion of the Corporation Counsel." [26]

Assuming, however, that Mr. Cooke's opinion does qualify as a formal one, we have said that rulings of the Corporation Counsel " 'are entitled to weight as construction of the District of Columbia Code unless plainly unreasonable or contrary to ascertainable legislative intent.' " *Jordan v. District of Columbia,* 362 A.2d 114, 118 (D.C.1976) (quoting *Williams v. WMA Transit Co.,* 153 U.S.App. D.C. 183, 189, 472 F.2d 1258, 1264 (1972)). In *Jordan,* we affirmed a decision of the Board of Appeals and Review which had sustained the Metropolitan Police Department's refusal to issue a license to carry a concealed pistol. Inherent in the analysis was a determination of whether the proceeding that led to denial of the license violated the so-called "sunshine" provision of the District of Columbia Self–Government and Governmental Reorganization Act, D.C.Code § 1–1504 (1992 Repl.). We independently reviewed the issue but took comfort in the

---

**26.** The April 23, 1987 Memorandum from Margaret L. Hines, Deputy Corporation Counsel, to Walter B. Ridley, Acting Deputy Director for Operations, Department of Corrections, was directed to a District of Columbia employee but was a memorandum of legal advice, not an Opinion of the Corporation Counsel. *See* Office Or-

der No.: 82–11, at 3 ("Memoranda of legal advice may be issued under the signature of the Deputy Corporation Counsel or Section Chief ... [and] shall not be characterized ... as a legal opinion or as an *opinion of the Corporation Counsel.*").

Corporation Counsel's opinion—which the Mayor had adopted and circulated to department heads and agencies—that "[t]he statute pertains to all official actions of an executive or legislative nature but does not apply to adjudicatory type hearings ('contested cases')." *Jordan*, 362 A.2d at 118. We gave "weight" to the Corporation Counsel's views, noting that "Congress expressed no intent at odds with that particular ruling." *Id.*

Even in granting "weight" to the Corporation Counsel's opinion, however, this court rejected some of the authority that the opinion cited, and there can be no doubt that this court conducted an analysis that stood on its own, without reliance on what the Corporation Counsel had to say. For that reason, our deference language in *Jordan* must be considered non-binding dictum.

In the years since *Jordan*, we have addressed the merits of Corporation Counsel opinions on three occasions. In two instances, without discussing the "weight" to be accorded, we rejected the opinion as "contrary to the plain meaning of the statute" at issue. *Upper Georgia Ave. Planning Comm. v. Alcoholic Beverage Control Bd.*, 500 A.2d 987, 990 (D.C.1985) (concluding that Corporation Counsel ignored plain meaning of statute in opining that "bona fide restaurant," as required for Class C liquor license, need not have meals as chief source of revenue); *accord French v. District of Columbia Bd. of Zoning Adjustment*, 658 A.2d 1023, 1030–31 (D.C.1995) (concluding that Corporation Counsel ignored plain language of D.C.Code § 1–1510(a) in opining that six-month period for applying for building permit or certificate of occupancy after Board decision is tolled by petition for judicial review). On the other occasion, citing *Jordan*, we acknowledged that a Corporation Counsel's opinion, "while not binding on this court, is entitled to great weight." *National Org. for Women v. Mutual of Omaha Ins. Co.*, 531 A.2d 274, 278 (D.C.1987) ("*NOW*").

*NOW*, however, presented a special situation. Plaintiffs had purchased life insurance polices at prices (attributable to gender-based actuarial tables) that were higher than the companies would have charged men of the same age and medical history. They contended that the Human Rights Act, D.C.Code §§ 1–2501 to 1–2557 (1987), precluded gender-based differentials in the insurance statute. In looking for the Council's intent under the Human Rights Act, we noted that at the time the Act was adopted the Insurance Code "allowed a maximum three year set-back for calculating life insurance premiums for women, but not for men." *NOW*, 531 A.2d at 277. We further noted that, "[i]n adopting the Act, the Council did not expressly acknowledge its arguable conflict with the Insurance Code." *Id.* We then considered the fact that, soon after adopting the Human Rights Act, the Council had requested an opinion from the Corporation Counsel on the legality under that Act of life insurance "set-backs" for calculating premiums for women but not for men. The Corporation Counsel issued an opinion saying that such set-backs were lawful. "In reliance on this formal opinion, the Council increased the permissible set-back to six years." *Id.* at 278.

In view of this legislative development, we agreed that the Human Rights Act did not bar the set-backs. Specifically, we concluded that "the Council did not intend the [Human Rights] Act to include gender-based insurance pricing within its scope," particularly because "the Council knew of the Corporation Counsel's construction [of the Human Rights Act], did not reject that construction or negate it by amending the Act, and, in fact, relied on it in enacting subsequent legislation" to increase the life insurance set-backs for women. *Id.* We therefore gave the Corporation Counsel's opinion deference only in the limited sense that we perceived the *Council* had relied on it and thus the *Council* implicitly had confirmed Corporation Counsel's interpretation of the Human Rights Act when the insurance statute was amended. *See also Dean v. District of Columbia*, 653 A.2d 307, 319–20 (D.C.1995) (interpreting *NOW*).[27]

---

27. One more of our cases should be mentioned for its reliance on a Corporation Counsel opinion entirely without regard to its merits. In *Rustin v. District of Columbia*, 491 A.2d 496 (D.C.1985), a wrongful death action, plaintiffs alleged the District had negligently failed to apply District

In no case, therefore, have we simply deferred to the Corporation Counsel's opinion on the merits, or even given it close-case tie-breaking authority. Even in *NOW*, we independently resolved the insurance set-back issue without deferring to Corporation Counsel's opinion, except as we saw that it influenced the Council's own decision.

We are aware that District agencies and persons outside the government commonly have relied on a formal Corporation Counsel opinion as a "guiding statement of law," absent "specific action by the Commissioner [i.e., Mayor] or Council to the contrary, or until overruled by controlling court decision." Reorganization Order No. 50, Part II.A.(a), D.C.Code tit. 1 App. at 180 (1973); *see French*, 658 A.2d at 1031 (opinions issued by District's "top legal officer may cause interested persons (and government agencies) to rely on them in good faith"). Nothing in our opinion today should be understood to discourage or diminish Corporation Counsel's very important role as chief legal advisor to the District government, including the responsibility to issue formal legal opinions from time to time on which government agencies and other interested persons can rely.

There is no reason, however, why this court should accord a formal opinion of the Corporation Counsel deference other than the court's willingness, as a matter of fairness, to come to grips with the issues and analysis that the Corporation Counsel—as an informed and respected participant in the process—offers for administrators and interested persons to consider. Interestingly, the very source of *Jordan*'s willingness to grant "weight" to the Corporation Counsel's views, namely, a quote from the federal circuit court in *Williams*, 153 U.S.App. D.C. at 189, 472 F.2d at 1264, was simply a statement by Judge Leventhal that rested on no cited authority and may have reflected no more than his courteous view, as a federal judge, that in substantially local matters the opinions of the chief District law officer should be accorded some undefined measure of respect.[28]

In any event, as indicated earlier in the discussion of deference to agency expertise, the question at issue here—implied repeal of one statute by another—is the kind of question that judges are called upon to make and

---

regulations in certifying a licensed security officer who shot a colleague while they both were on duty in a federal building. *See id.* at 498. On request of the General Services Administration through the Mayor, the Corporation Counsel issued a formal opinion concluding that District regulations were not intended to cover security matters of the federal government or security officers while on federally owned or leased premises. *See id.* at 499. This court held that the District's reliance on that opinion in failing to apply the regulations to the shooter was a discretionary, policy decision that, under the doctrine of sovereign immunity, protected the District against suit. *See id.* at 500–01. In response to the appellants' request that we "examine the merits" of the Corporation Counsel's opinion, we expressly "decline[d] to do so." *Id.* at 501 n. 8. Because the very fact of the District's reliance on the opinion, not the correctness of the opinion itself, was critical to our decision, *Rustin* is irrelevant to this case.

**28.** In *Techworld Development Corp. v. District of Columbia Preservation League*, 648 F.Supp. 106 (D.D.C.1986), the United States District Court for the District of Columbia—in an opinion without binding effect here—cited *Williams* (and *Chevron*) for the proposition that "opinions rendered by the Corporation Counsel concerning the application of the HBA [Height of Buildings Act of 1910] are entitled to substantial deference, and should only be overturned by this court if they are plainly unreasonable or contrary to legislative intent." *Techworld Dev. Corp.*, 648 F.Supp. at 121. The court then sustained the Corporation Counsel's position. Apparently, the Corporation Counsel was the District official charged by the Mayor to work with the Office of the Surveyor to ascertain maximum allowable building height. *See id.* Under this particular statute, therefore, as interpreted by the federal district court, the Corporation Counsel implemented "a consistent, demonstrable administrative practice," a fact that "further add[ed] to the weight of the Corporation Counsel's opinion." *Id.* at 121–22. The court then explained that "[t]he pernicious result of undoing this long-standing practice would be to expose at least three other buildings in downtown Washington to HBA claims." *Id.* at 122. All things considered, we understand the district court to have perceived, and in part premised its opinion on, the Corporation Counsel's acting as the functional equivalent of an executive agency charged with administering a statute—an understanding buttressed by the court's substantial reliance on *Chevron*, 467 U.S. at 844–45, 104 S.Ct. at 2782–83, to justify the court's deference. *See Techworld Dev. Corp.*, 648 F.Supp. at 121–23. This federal court opinion, therefore, is meaningfully distinguishable from the case now before us.

that this court, as final arbiter within the District's judicial system, is not permitted to delegate to others to answer, not even to the lesser degree of presumptive deference to the Corporation Counsel, subject to rejection when "plainly unreasonable or contrary to ascertainable legislative intent." *Jordan,* 362 A.2d at 118 (internal quotation marks omitted) (dictum). In a matter purely of law, such as a claimed implied repeal where no extra-legal expertise is necessary to help inform the decision, the Corporation Counsel's views—like those of an amicus curiae—are likely to be helpful, but they have no special place in the decisional calculus. The Corporation Counsel's opinion may be more enlightened and persuasive than the court's own decision turns out to be, but "the opinions of the Corporation Counsel are not valid legal authority." *French,* 658 A.2d at 1031. Ultimately, that office is left to its power as a persuader; it does not get even a presumptive or partial vote in the court's decision.

In this case, the Corporation Counsel does not persuade us. The opinion—Mr. Cooke's letter to Mr. Glynn, General Counsel of the Commission—does not account for the detailed legislative development of the Good Time Credits Act of 1986, as elaborated above in Part II. of this opinion; the Corporation Counsel is more conclusory than usual.

When we have agreed with the Corporation Counsel, as in *Jordan,* we have taken satisfaction in that alliance, but when we have disagreed—as we do here—we have not hesitated to rule the other way. *See French; Upper Georgia Ave. Planning Comm.* For all the foregoing reasons, therefore, we do not accord the Corporation Counsel's letter to Mr. Glynn the deference appellee Noble and the District call for here.[29]

### E.

Noble and the District offer still another argument. They say that the Council has amended other aspects of the Good Time Credits Act three times—assertedly aware of the Department of Corrections' interpretation of § 24-431(a) in 35 D.C. Reg. 1077 (1988) (to be codified at 28 DCMR 601.7)—without revising that section to restore the rule of § 24-206(a). They then emphasize that "a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of [the legislature] and not changed by it, is almost conclusive evidence that the interpretation has [legislative] approval." *Kay v. FCC,* 143 U.S.App. D.C. 223, 231–32, 443 F.2d 638, 646–47 (1970); *accord NOW,* 531 A.2d at 278. Noble and the District accordingly urge us to apply this rule of legislative acquiescence here.

There is, however, no demonstrable evidence that the Department of Corrections' interpretation of § 24-431(a) was before the Council, or that the Councilmembers were otherwise aware of it, when they amended the Act on these three occasions. All we can say is that the Council was aware of the particular concerns they addressed. It appears, more specifically, that two of the amendments were responses to specific judicial interpretations of the Good Time Credits Act. In the first, the Council amended the Act[30] to vitiate the United States District

---

**29.** Interestingly, although the Supreme Court once said that an Attorney General's opinion was entitled to "some weight," the Court did not explain what that meant and distinguished the proffered opinion on the facts. *McElroy v. United States ex rel. Guagliardo,* 361 U.S. 281, 285, 80 S.Ct. 305, 308–09, 4 L.Ed.2d 282 (1960). On another occasion the Court had been "reluctant to disagree with the opinion of the Attorney General"—but did so. *Perkins v. Elg,* 307 U.S. 325, 348, 59 S.Ct. 884, 896, 83 L.Ed. 1320 (1939). The Court has been more willing to find "highly persuasive" or of "great weight" the opinion of a state attorney general, presumably because that official was opining on state, not federal, law. *See Harris County Comm'rs' Court v. Moore,* 420 U.S. 77, 87 n. 10, 95 S.Ct. 870, 877

n. 10, 43 L.Ed.2d 32 (1975); *Phyle v. Duffy,* 334 U.S. 431, 441, 68 S.Ct. 1131, 1135–36, 92 L.Ed. 1494 (1948). Because this court and the Corporation Counsel function in the same court system, the cases in which a federal court has deferred to the opinion of a state attorney general—where the latter official arguably has had greater interpretative expertise—do not apply here (a point our dissenting colleague misses, see *post* at p. 1114 n. 14 (Schwelb, J., dissenting)).

**30.** Good Time Credits Temporary Amendment Act of 1989, D.C. Act 8–51, 36 D.C.Reg. 4740 (1989) (temporary emergency act); Good Time Credits Amendment Act of 1989, D.C. Act 8–71, 36 D.C.Reg. 5761 (1989) (enrolled original).

Court's *Cunningham* decision [31] holding that the Act applied to persons convicted of first degree murder. *See Winters v. Ridley*, 596 A.2d 569, 571 (D.C.1991) (per curiam) (Schwelb, J., concurring) (noting that "[t]he Council's reaction" rejecting *Cunningham* "was swift and emphatic"). Another amendment of the Act [32] apparently was intended to change the law after two federal circuit court decisions held the Act inapplicable to prisoners housed in non-District facilities. *See Jackson v. Thornburgh*, 285 U.S.App. D.C. 124, 125, 907 F.2d 194, 195 (1990) (noting that female prisoners housed in federal facility were not eligible for Good Time Credits Act); *Moss v. Clark*, 886 F.2d 686, 688 (4th Cir.1989) (noting that District prisoner in federal facility was not eligible for Good Time Credits Act).

The third amendment creating discretionary "meritorious good time credits," while not in response to a particular interpretation of the Act, evidenced no Council awareness of the § 24–431(a)/ § 24–206(a) issue.[33] The three amendments, therefore, provide no basis for concluding that the Council endorsed a particular interpretation of § 21–431(a).

It is interesting to note that, while the Council was in the process of amending the Act to reject *Moss* and *Jackson*, the Council did not act when the United States Court of Appeals for the Ninth Circuit, in a case legally identical to this one, issued an opinion adopting the United States Parole Commission's interpretation that § 24–431(a) did not impliedly repeal § 24–206(a). *See Tyler v. United States*, 929 F.2d 451, 455–57 (9th Cir.1991).[34] Although one could argue that this failure to act is at least as significant as the Council's silence about the Department of Corrections' interpretation of § 24–431(a), we do not think the Council's failure to respond to *Tyler* suggests that the Council

approved of the Ninth Circuit's opinion—assuming the Council learned about it. We point out the non-response to *Tyler* only to highlight the hazard of attempting to impute meaning to legislative inaction unless it is absolutely clear the Council can be said to have known about an issue, cared about it, and somehow dealt with it.

In any event, there is serious debate and doubt as to when, if ever, a later legislature has a role in construing what an earlier legislature intended. *Compare Winters*, 596 A.2d at 579 & n. 16 (Ferren, J., concurring in the result) ("[T]he Supreme Court often has said 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960))) *with NOW*, 531 A.2d at 278 ("[I]t is proper to view the later act 'as a legislative interpretation of the earlier act.'" (quoting *United States v. Stewart*, 311 U.S. 60, 65, 61 S.Ct. 102, 105–06, 85 L.Ed. 40 (1940))). Thus, even if later Councils approved the Department's interpretation of § 24–431(a), that is not necessarily valid evidence of the intent of the Council that enacted it.

Noble's and the District's argument based on Council inaction/acquiescence, therefore, fails.

### F.

◼ Finally, Noble and the District invoke the rule of lenity: "When a penal statute is capable of two or more reasonable constructions the 'rule of lenity' directs our attention to the least harsh among them." *Henson v. United States*, 399 A.2d 16, 21 (D.C.1979) (citing *United States v. Stokes*, 365 A.2d 615, 619 (D.C.1976)). We have called this lenity principle, however, a "secondary" rule of con-

---

**31.** *Cunningham v. Williams,* 711 F.Supp. 644 (D.D.C.1989), *rev'd sub nom. Poole v. Kelly,* 293 U.S.App. D.C. 329, 954 F.2d 760 (1992).

**32.** District of Columbia Good Time Credits Amendment Act of 1991, D.C. Act. 9–51, 38 D.C.Reg. 4090 (1991).

**33.** Omnibus Criminal Justice Reform Amendment Act of 1994, D.C. Act 10–238, § 802, 41 D.C.Reg. 2608, 2616 (enrolled original) (creating

discretionary "meritorious good time credits" while limiting use of meritorious good time credits and educational good time credits in cases involving violent offenders).

**34.** Although we agree with the result in *Tyler,* where the court arrived at the same conclusion we do here—without certifying the case for this court's ruling—we do not rely on *Tyler* to inform the analysis.

struction. *Luck,* 617 A.2d at 515. It "only serves as an aid for resolving an ambiguity; it is not to be used to beget one," *Callanan v. United States,* 364 U.S. 587, 596, 81 .S.Ct. 321, 326, 5 L.Ed.2d 312 (1961), let alone to create an irreconcilable conflict between statutes that is not otherwise there. The rule of lenity, therefore, can "tip the balance in favor of criminal defendants only where, exclusive of the rule, a penal statute's language, structure, purpose and legislative history leave its meaning genuinely in doubt." *Lemon v. United States,* 564 A.2d 1368, 1381 (D.C. 1989) (internal quotation marks omitted); *see Luck,* 617 A.2d at 515. The meaning of § 24–431(a) is not genuinely in doubt, given the primary rule of construction limiting implied repeals to cases where statutes irreconcilably conflict. *See, e.g., Morton,* 417 U.S. at 549, 94 S.Ct. at 2482. As the legislative history reveals, there is no irreconcilable conflict here between §§ 24–431(a) and 24–206(a). The very grounds necessary before applying the rule of lenity, therefore, are not present.

### G.

By answering the certified question "yes," we inevitably force a question the parties have identified in their briefs, indirectly, by expressing concern about impact on the prisoner population: whether there should be any limitation on the class of prisoners the ruling should reach; i.e., the issue of retroactivity/prospectivity.

Long ago, the Supreme Court admonished that, where longtime practice has bred reliance on a particular construction of law, even though "this practical construction cannot be admitted as controlling, it is not to be overlooked." *Union Ins. Co. v. Hoge,* 62 U.S. (21 How.) 35, 66, 16 L.Ed. 61 (1858). We therefore have recognized that there can be reliance interests that justify prospective application of a court decision that rejects a formal opinion of the Corporation Counsel. In *French,* for example, we permitted a property owner to proceed with an untimely application for a building permit and a certificate of occupancy because of her reliance on a long-standing Corporation Counsel opinion. In doing so, we held that opinion erroneous

but made our ruling prospective for equitable reasons. *See French,* 658 A.2d at 1031–32. We therefore flag the question whether Noble has a legitimate reliance interest in the Department of Corrections regulation, 28 DCMR § 601.7, derived from the Corporation Counsel's opinion of October 30, 1987. See *supra* Part III.B.

This is not a situation where the legislature unquestionably has given credits toward completion of a sentence and then taken them away, violating the Ex Post Facto Clause. *See Lynce v. Mathis,* —— U.S. ——, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (holding that once state legislature has unambiguously awarded good time credits, adoption of later statute retroactively canceling portion of credits violates Ex Post Facto Clause); *Weaver v. Graham,* 450 U.S. 24, 36, 101 S.Ct. 960, 968, 67 L.Ed.2d 17 (1981) (holding that state legislature may not reduce rate at which good time credits are accumulated by prisoners sentenced at time when more generous rate was in effect without violating Ex Post Facto Clause). Here, in contrast, the question whether the legislature, in § 24–431(a), has awarded credits for street time accrued before a parole revocation has not yet been definitively resolved.

The only appellate court that has ruled to date on the § 24–431(a) issue, however, gave the same answer in 1991 that we give here. *See Tyler,* 929 F.2d at 455–56. The *Tyler* decision, therefore, was announced over two years before Noble's 1993 parole revocation that has triggered his claim to pre-revocation street time. On the other hand, for whatever relevance it may have to a prisoner's legitimate reliance interest, we note again that the Department of Corrections adopted a formal regulation, 35 D.C.Reg. 1077, 1078 (1988) (to be codified at 28 DCMR § 601.7), on February 19, 1988, incorporating the Corporation Counsel's view that D.C.Code § 24–431(a) preserved time spent on parole as a credit toward service of the sentence, even though parole had been revoked.

We express no opinion on whether Noble has a justifiable basis for arguing on ex post facto, if not on equitable, grounds that the § 24–206(a) prohibition of credit for street time after his parole revocation should not

apply to him. We believe it has been important, however, to identify some of the arguments and authorities that will help provide the answer.

The District of Columbia claims its own reliance interest, suggesting in its brief that a ruling contrary to the Department of Corrections' and Corporation Counsel's views "could create chaos in the retroactive adjustment of the sentences of parole violators" and would force the District to "search for and reincarcerate ex-offenders" whose sentences have been served in conformity with 35 D.C.Reg. 1077, 1078 (1988) (to be codified at 28 DCMR § 601.7). We are not at all sure that the District would be obliged, or would elect—or even would be legally permitted—to reincarcerate former prisoners whose sentences have been deemed satisfied. *See Johnson v. Williford,* 682 F.2d 868, 871–73 (9th Cir.1982) (concluding that equitable estoppel and due process preclude government from revoking parole of felon convicted under statute requiring minimum ten year prison term without possibility of parole, but

released on parole for fifteen months before error was discovered). Furthermore, if recomputation of sentences is considered unacceptable, "a remedy may easily be fashioned." *J. Parreco & Son v. District of Columbia Rental Housing Commission,* 567 A.2d 43, 49–50 (D.C.1989). We see no obstacle to the Council's amending the statute to provide retroactive relief in such cases—and even relief for all other cases through amendment of § 24–206(a), for that matter—since ameliorative sentencing legislation does not pose ex post facto law problems. *See Weaver,* 450 U.S. at 37, 101 S.Ct. at 968–69 (Rehnquist, J. concurring in judgment) ("As the court recently noted: 'It is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law'" (quoting *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977))).

\* \* \*

For the reasons elaborated above, we answer the certified question "yes." [35]

**35.** According to the dissent, because the words "or on parole" in D.C.Code § 24–431(a) are so clear, so unequivocal, the older language in D.C.Code § 24–206(a)—said to be plainly inconsistent and thus "irreconcilable" with § 24–431(a)—was implicitly repealed. The fundamental problem with this analysis is that the words "or on parole," in context, do not at all clearly and unequivocally mean what the dissent says they do when (1) read together with § 24–206(a), as we must, and (2) interpreted in light of the legislative history. We have pointed out that, on their face, see *supra* at p. 1087, the two provisions plainly are consistent—reconcilable—with one another in providing a general rule, § 24–431(a), subject to an exception, § 24–206(a). We have elaborated in Part II., moreover, why the clarity our dissenting colleague sees in the words "or on parole" in § 24–431(a) is superficial. Looked at sequentially, without omissions, the legislative development from 1932 to 1987—including evolution of the Good Time Credits Act of 1986 from the initial bill, through the "markup" version, until the final bill—indicates strong support for the conclusion that the words "or on parole" do not supplant the prohibition against credit for street time enacted in § 24–206(a). The dissent, however, selectively relies on pieces of the legislative development, taken out of order and context, to prove its point. For example, our colleague justifies his reading of "or on parole" by reference to the earliest (withdrawn) subsection (d): parole revocation shall "not forfeit good time credits earned while on parole." This reliance conveniently ignores the fact that, later at markup, the Council substituted for sub-

section (d) a new subsection (c), limiting good time credits to those previously earned while in physical custody, and then abandoned even the new subsection (c) in the final bill. See *supra* at pp. 1090–1094. To say, as the dissent does, that the words "or on parole" in the final bill took on the meaning of the earliest, withdrawn subsection (d)—without effectively explaining how that squares with the intervening legislative steps—is a stretch that cannot be justified, especially when implied repeal is so strongly disfavored. *See Luck,* 617 A.2d at 515.

In response to the dissent's preferred deference to interpretations of § 24–431(a) by the Department of Corrections and by the Corporation Counsel—including the import of *Luck* for our decision in this regard—we refer to our discussion in Part III. above, except to add that our colleague's deference to the May 22, 1987 memorandum of Deputy Corporation Counsel Margaret L. Hines—opining that the "apparent reason for the bill's failure expressly to repeal the inconsistent language of D.C.Code § 24–206 (1981) was that no one [on the Council] discovered the inconsistency"—is particularly inappropriate. Judge SCHWELB defers to this understanding of Council ignorance, and then infers that the Council would have removed the inconsistency by repealing the limitation in § 24–206(a),—because "Ms. Hines was writing almost contemporaneously with the passage of the Act, and her information was surely far more reliable than any speculation by this court, years after the fact, as to why Section 24–206(a) was not repealed in

SCHWELB, Associate Judge, dissenting:

I am unable to agree with my colleagues' disposition of the certified question. In my opinion, the majority's interpretation of Section 5(a) of the Good Time Credits Act of 1986 (GTCA), D.C.Code § 24-431(a) (1996), contravenes the plain language of the statute and conjures up an imaginary ambiguity where none really exists. Judge Ferren endeavors earnestly to harmonize the GTCA with Section 24-206(a) (1996), but, in my judgment, the repugnancy between the two statutes is manifest and cannot be cured or alleviated by resort to an imaginative "construction" which, as I see it, contorts the statutory language.

In ascribing to the legislature an intention which the words of the GTCA will not countenance, the majority has also declined to accord appropriate consideration to the executive construction of the GTCA. That construction has remained consistent from the time that the statute was enacted until the present. In what I view as a departure from the rule of *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971), my colleagues have declined to follow a key part of our decision in *Luck v. District of Columbia*, 617 A.2d 509, 515 (D.C. 1992) (*Luck I*), a case in which we held unambiguously that the interpretation by the District of Columbia Department of Corrections (DOC) of the identical statutory provisions here at issue, and of the interplay between them, is entitled to "great weight." Finally, the majority has impermissibly construed a penal statute broadly beyond its text, to the prejudice of the liberty of the citizen. *See, e.g., Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958).

The majority's disposition, if it is permitted to stand, has placed in jeopardy the settled expectations of many hundreds or even thousands of parolees and their families. Numerous men and women will remain incarcerated for far longer than previously expected, and the District government will be confronted with the thankless task of deciding what to do about those defendants who, under the majority's new construction of the GTCA, must be deemed to have been prematurely released from prison. The District of Columbia, as *amicus curiae*, warns us that any retroactive adjustment of sentences is likely to cause much ill will and even chaos, and that prediction may be well-grounded.

To be sure, the unfortunate practical consequences that may flow from my colleagues' holding cannot be dispositive, for we are obliged to carry out a legislative mandate regardless of our views of the policies that underlie it. In my opinion, however, the travail that this decision is likely to cause is quite unnecessary. It flows from an incorrect interpretation of the relevant statutes and, as to executive construction, from the court's departure from binding precedent.[1] Accordingly, I respectfully dissent.

I.

STATUTORY ANALYSIS

A. *The statutes at issue.*

In 1932, Congress provided, in what is now D.C.Code § 24-206(a) (1996), that if a grant of parole is revoked, then

the prisoner, unless subsequently reparoled, shall serve the remainder of the sentence originally imposed less any com-

---

so many words." *Post* at p. 1109. This analysis comes dangerously close to saying that Ms. Hines' understanding should be honored because she knew what was going on behind the scenes and can tell us what the Council really meant—a deference, in effect, to off-the-record, hearsay legislative intent. We cannot accept that approach.

1. Noble claims that the case as a whole, and not merely the issue of executive construction, is governed by *Luck I* and *Franklin v. Ridley*, 635 A.2d 356 (D.C.1993). In both of these cases, however, the parties assumed that Section 24–

431(a) confers credit for street time served after the effective date of the GTCA, regardless of whether or not parole has been revoked. The opinions for the court were written in conformity with that assumption. The United States Parole Commission ("USPC" or "the Commission") was not a party in either case, and the position which the Commission is presenting to us here was not argued to the court in *Luck I* or in *Franklin*. Under these circumstances, I do not consider either *Luck I* or *Franklin* to be controlling authority in the present case. *See, e.g., District of Columbia v. Sierra Club*, 670 A.2d 354, 360 (D.C. 1996).

mutation for good conduct which may be earned by him after his return to custody. . . . *The time a prisoner was on parole shall not be taken into account to diminish the time for which he was sentenced.*

(Emphasis added.) It is undisputed that if this case were governed by Section 24–206(a) alone, then Noble would not be entitled to credit for street time accrued before his parole was revoked in 1993.

More than half a century after the 1932 statute went into effect, the Council of the District of Columbia, acting in response to an "unprecedented crowding problem in [the District's] correctional institutions,"[2] enacted the Good Time Credits Act. The GTCA provides in pertinent part that

*[e]very person* shall be given credit on the maximum and the minimum term of imprisonment for time spent in custody *or on parole* as a result of the offense for which the sentence was imposed.

D.C.Code § 24–431(a). (Emphasis added.)

Read literally, the language of Section 24–431(a) is inconsistent with that of Section 24–206(a). The GTCA, on its face, authorizes credit for street time for all parolees, whether or not parole has subsequently been revoked. Section 24–206(a), on the other hand, proscribes credit for street time in the event of revocation. In light of this apparent inconsistency between the two provisions, the question before the court is whether the later statute effected a *pro tanto* repeal of the earlier one.

## B. *The Good Time Credits Act.*

"[N]ot only at the beginning, but [also] at the ending, is the Word." *J. Ungar, Inc. v. Comm'r of Internal Revenue,* 244 F.2d 90, 94 (2d Cir.1957) (Learned Hand, J.). In determining whether the GTCA implicitly repealed Section 24–206(a), we look first (and perhaps also last) to the language of Section 24–431(a), for the Council's intent must be discerned from what the Council has written.

Textually, Noble and the District present a powerful case. Noble points out in his brief that "every person" means every person, and that

[Section 24–431(a) ] does not, as the Commission would have it, state "every person *except parole violators.*" The statute does not state "every person shall receive credit *except if parole is violated and revoked.*"

(Emphasis added.) In response to the contention of the USPC that, in context, Section 24–431(a) authorizes credit for street time only for those defendants whose parole has not been revoked, Noble invokes the prose of Justice Brandeis:

What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.

*Iselin v. United States,* 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926); *see also West Virginia Univ. Hosps. v. Casey,* 499 U.S. 83, 101, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991) (quoting *Iselin* ); *Luck I, supra,* 617 A.2d at 513. As a matter of plain syntax, Noble has it right, and I am unable to discern the slightest textual ambiguity in Section 24–431(a).[3]

Moreover, for all practical purposes, the construction of Section 24–431(a) proposed by the Commission and adopted by the majority strips the provision authorizing credit for street time for persons on parole of any significant effect. Under the interpretation suggested by the USPC, "there would be few, if any, instances in which the GTCA would apply, since a prisoner whose parole elapses without revocation would have completed his or her sentence, and credit for street time would be irrelevant." *Beaty v. Ridley,* No. SP 138–93 (Super.Ct.D.C. Jan. 26, 1993) (Alprin, J.). "A basic principle [of statutory construction] is that each provision of the statute should be construed so as to

---

**2.** *See* Council of the District of Columbia, Committee on the Judiciary, Report on Bill 6–505, District of Columbia Good Time Credits Act of 1986, (Nov. 11, 1986) (hereinafter Committee Report).

**3.** The reader is invited to decide for himself or herself whether the purported ambiguity to which Judge Ferren refers, see, *e.g., maj. op.* at p. 1105 n. 35, is real or imaginary.

give effect to all of the statute's provisions, not rendering any provision superfluous." *Veney v. United States,* 681 A.2d 428, 433 (D.C.1996) (en banc) (citation omitted); see also the Corporation Counsel's construction of the GTCA, *infra,* at pp. 1112–1113.

Our elected representatives are intelligent, literate people. They know how to write what they mean. It is difficult to understand how a single Councilmember who did *not* intend to grant credit for street time for all parolees could have voted for a statute which grants *every* person credit for time spent in custody *or on parole.* It is even more difficult to believe that *all* of the Councilmembers who enacted this statute would have done so if their intent had been something completely at odds with the meaning of the words. Judge Ferren suggests that the drafters intended merely to formalize past practice governing the situation when an inmate completes the sentence without revocation of parole. If that was their intent, however, they most assuredly did not say so.

The majority's construction of the GTCA presupposes that the drafters either did not read what they had written or, if they did, that they failed to notice what they had said about credit for street time for "*every* person" who was "in custody *or on parole.*" The majority's position is necessarily predicated on the hypothesis that the Councilmembers voted for the GTCA as written without being aware that it says what it says. This is conceivable, I suppose, but surely very, very unlikely.

"The court even in a good cause may not impose on words a meaning that they will not bear." *United States v. Nord Deutscher Lloyd,* 186 F. 391, 395 (S.D.N.Y.1911) (Learned Hand, J.), *rev'd on other grounds,* 223 U.S. 512, 32 S.Ct. 244, 56 L.Ed. 531 (1912). Whether "the cause" in this case is good or bad is not for the court to decide, but the words of Section 24–431(a) will not bear the meaning that the majority would ascribe to them.

## C. *Repeals by implication.*

The majority argues, and I agree, that we cannot resolve the issue in this case by considering Section 24–431(a) in isolation. "The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them." *Luck I, supra,* 617 A.2d at 514 (quoting *United States v. Freeman,* 44 U.S. (3 How.) 556, 564–65, 11 L.Ed. 724 (1845)).

Repeals by implication are not favored. *Luck I, supra,* 617 A.2d at 514 (citation omitted). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is [that] the earlier and later statutes are irreconcilable." *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974). "The presumption against implied repeals is overcome, however, by a showing that the two acts are irreconcilable, clearly repugnant as to vital matters to which they relate, and so inconsistent that the two cannot have concurrent operation." 1A NORMAN J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION, § 23.10 at 354 (5th ed.1992) (footnote omitted). The Supreme Court has held that where the "provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one." *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936) (citations omitted). The question is therefore whether the two statutes under consideration can rationally be reconciled—whether, in other words, they are capable of "concurrent operation."

In the present case, a statute enacted in 1932 provided that defendants whose parole has been revoked should not receive credit for street time. More than half a century later, the Council directed that *every person,* without any stated exception, shall receive credit for time spent in custody *or on parole.* As to those defendants whose parole has been revoked, the two statutes are in obvious and irreconcilable conflict. The contradiction between them goes to the very heart of Section 24–431(a), for, if that provision is construed as inapplicable to defendants whose parole has been revoked, it will not provide any discernable benefit to anybody. "Reconciliation" of the two statutes is thus a mirage. A device capable of harmonizing

two such mutually antagonistic enactments— the Montagues and Capulets of parole— would be a magic wand indeed. Such an instrument could just as readily reconcile the Eighteenth and Twenty–First Amendments, so that Prohibition and legal liquor could enjoy "concurrent operation" and bring joy to boozers and blue noses alike.

"Statutory interpretation is an imperfect science, and generalities about statutory construction help us little. They are not rules of law, · but merely axioms of experience." *Speyer v. Barry,* 588 A.2d 1147, 1165 (D.C. 1991) (citation omitted). The presumption against implied repeals is a helpful aid in the interpretation of statutes, but it was not designed to permit the court to make a law mean. the opposite of what it says. The canon on which the Commission relies simply will not take it where the Commission seeks to go.

There is also a compelling, case-specific reason why we should not accord decisive weight here to the presumption against implied repeals. That presumption is based on the premise

> that when a legislature contemplates passing a new statute it is careful to search the statute book for any statute that might overlap the new one, and if it finds any such older statute . . . in force it repeals it explicitly when passing the new one. "The presumption against implied repeals is founded upon the doctrine that the legislature is presumed to envision the whole body of the law when it enacts new legislation." 1A Sutherland Statutory Construction § 23.10 at p. 346 (4th Ed.1985).

*Edwards v. United States,* 814 F.2d 486, 488 (7th Cir.1987) (Posner, J.). But if the legislators who passed the later statute were not apprised of the earlier enactment, then the justification for applying this presumption is fatally undermined.

In the present case, as I show in more detail below, there is persuasive and pragmatic contemporaneous evidence that the Council did not consider the earlier statute at all. Specifically, in a memorandum explaining the operation of the GTCA issued twelve days after the new law's effective date, Deputy Corporation Counsel Margaret L. Hines explained that "[t]he apparent reason for the bill's failure expressly to repeal the inconsistent language in D.C.Code § 24–206 (1981) was that no one discovered the inconsistency . . . ." [4] Ms. Hines was writing almost contemporaneously with the passage of the Act, and her information was surely far more reliable than any speculation by this court, years after the fact, as to why Section 24–206(a) was not repealed in so many words.[5]

Under these circumstances, I cannot agree that the presumption against repeals by implication trumps the plain terms of Section 24–431(a). If, as Ms. Hines suggested at the time, the members of the Council were unaware of Section 24–206(a), then their failure expressly to repeal it lacks any probative value. If, on the other hand, the legislators had Section 24–206(a) in mind, then it is surely unlikely, to say the least, that they would have cast Section 24–431(a) in the all-inclusive language found in that provision unless they intended the later enactment to trump the earlier one.

Consider what must have happened if Judge Ferren has it right. The drafters and the Council, according to him, are supposed to have been aware of the provisions of Section 24–206(a). They wanted to retain that statute in effect and to reaffirm the rule that a defendant receives no credit for street time if his parole is revoked. They also wished to

---

4. *See* Memorandum of April 23, 1987 from Margaret L. Hines, Deputy Corporation Counsel, to Walter B. Ridley, Acting Deputy Director of Operations, Department of Corrections, entitled "Implementation of the District of Columbia Good Time Credits Act of 1986, D.C. Law 6–218."

5. Contrary to the final paragraph of *Judge Ferren's* final footnote, I am not suggesting that Ms. Hines was guilty of the "separation of powers" equivalent of industrial espionage, or of some

other comparable legerdemain, and then of leaking inside information. As a matter of common sense, an executive branch attorney working contemporaneously for the enactment of a proposed statute can be expected, quite legitimately, to know what is going on. So far as I am aware, there is no taboo in effect against communication between the proponents of a bill and the legislators who must decide whether, and in what form, it is to be enacted.

reaffirm street time credit for those defendants whose parole was not revoked (and who did not need the credit anyway). "I know how to do that!" the leader of the drafting team must have exclaimed or thought. "I will write a provision which says that *every* person shall receive credit for time spent 'in custody *or on parole.'* That way, everybody will know that you get no credit if your parole is revoked." The Councilmembers must then have read the finished product and joyfully proclaimed: "Right on! You've written it to say exactly what we meant!" I respectfully suggest that this scenario is implausible, and that if the drafters and the legislators intended what my colleagues say they intended, then they could not have written and enacted the statute as it now reads.

D. *The legislative history.*

The majority deals at some length with the legislative history of the GTCA. Given what I regard as the unambiguous language of Section 24–431(a), it is not obvious that resort to legislative history is called for at all. *See, e.g., Duvall v. United States,* 676 A.2d 448, 452–53 (D.C.1996).[6] In any event, the legislative history, as described in the majority opinion, may arguably tilt in some measure in favor of Judge Ferren's position, but it is inconclusive with respect to the issue before us.[7]

As Judge Ferren points out, the original version of Section 5(a) authorized credit for time spent "in custody," but not on parole.

*Maj. op.* at pp. 1090–1091. Section 5(d) as initially drafted, however, would have provided as follows:

> (d) In any case in which parole is revoked for violations of the conditions of parole and the person is recommitted to serve the remainder of the maximum term, the person *shall not forfeit good time credits earned while on parole.*

(Emphasis added.) Obviously, the author of this draft of Section 5(d) intended defendants to receive credit for street time notwithstanding the revocation of parole.

The proposed legislation went through a number of successive versions, which did not contain the language italicized above. See *maj. op.* at pp. 1090–1092. Ultimately, however, the Judiciary Committee added language, subsequently enacted as Section 24–431(a), to the effect that "[e]very person shall be given credit ... for the time spent in custody *or on parole* as a result of the offense for which sentence was imposed."

The majority says that the Judiciary Committee proposed this language, and the Council enacted it, all "without explanation." In my opinion, the explanation is not hard to find. The Council had before it a proposal that all defendants receive credit for street time. There was a competing proposal which would have denied such credit to those defendants whose parole had previously been revoked. The trend, for a while, appeared to be in favor of the latter approach, but a final choice had to be made.[8] The Committee

---

**6.** "It is elementary in the law of statutory construction that, absent ambiguity or an absurd or unreasonable result, the literal language of a statute controls and resort to legislative history is not only unnecessary but improper." *Elm City Broadcasting Corp. v. United States,* 98 U.S.App. D.C. 314, 319, 235 F.2d 811, 816 (1956) (citation omitted); *Duvall, supra,* 676 A.2d at 452. In this case, the language of Section 24–431(a) is clear and unambiguous. Because we are dealing here with two statutes rather than with one, however, and because the presumption against implied repeals must be incorporated into our analysis, an inquiry into legislative history may be appropriate notwithstanding the lack of any ambiguity.

**7.** The section-by-section analysis of the GTCA, as that statute was originally drafted, provided that "a person [shall] be given credit for time spent in custody pending trial and time spent on parole.

Additionally, if parole is revoked, good time credits are to be computed on the basis of the original maximum sentence." COMMITTEE REPORT at 3. The text of the statute was subsequently revised, however, and the section to which this discussion applied was rewritten. The Corporation Counsel viewed the revision as not having affected, in any relevant manner, the underlying legislative intent. "Generally, [however], the rejection of an amendment indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment." 2A SUTHERLAND, *supra,* § 48.18, at 369.

**8.** The presentation of different proposals to the Council of the District of Columbia mirrors the existence of different approaches in other jurisdictions; some statutes deny credit for street time where parole has been revoked, some authorize it, and some leave the issue to the discre-

reported a bill that provided credit for street time for all defendants, regardless of whether parole had been revoked. The Council enacted the bill in that form. That is the explanation.

The reader may think it odd that the amount of time a defendant must spend in prison is to be reduced by a period that he spent at liberty, even when he has abused that liberty by violating his parole. I have wondered myself why this should be so.[9] In my opinion, however, the legislature has decreed in unambiguous language that *all* defendants shall receive credit for street time. It is not the court's role to question that decision.

## II.

### EXECUTIVE CONSTRUCTION

A. *Introduction.*

The majority's interpretation of Section 24–431(a) is contrary not only to the unambiguous language of that provision but also to its construction by the District of Columbia officials charged with its administration and enforcement. The executive branch of the District government adopted that construction less than two weeks after the enactment of the GTCA. Three different District of Columbia agencies have now consistently adhered to it for an entire decade. In conformity with a formidable array of precedents which we have already applied to the very statutes under consideration in this case, *see Luck I, supra,* 617 A.2d at 515, we are bound to accept the executive construction if it is a reasonable one. Here, the interpretation by the Corporation Counsel, the District of Columbia Department of Corrections (DOC), and the District's Board of Parole (BOP) is

consistent with the statutory text and eminently reasonable. Given our unambiguous decision in *Luck I,* my colleagues' refusal to accord appropriate weight to the interpretation of the statute by the District's officers and agencies is contrary to *M.A.P. v. Ryan, supra,* 285 A.2d at 312, and passing strange besides.

An understanding of the background of the executive construction is important. The proposed legislation which became the GTCA had the support of the executive branch of the District of Columbia government. Hallem Williams, the Director of the DOC, testified in favor of its passage. Indeed, he proposed certain revisions which the Council subsequently adopted.[10] There is no doubt that members of the executive branch followed with some interest legislative developments relating to the proposed statute. The construction of the GTCA by District of Columbia officials must be assessed in the context of their role during and immediately after the enactment of the new law.

B. *Corporation Counsel's interpretation of the GTCA.*

Less than two weeks after the GTCA became effective, the Deputy Corporation Counsel prepared a memorandum for the DOC in which she responded to various questions relating to the meaning of the new legislation. In that memorandum, Ms. Hines wrote, *inter alia,* as follows:

> [Question]. Is § 5(a) of the act[11] inconsistent with D.C.Code § 24–206 (1981)?
>
> [Answer]. Yes. Section 5(a) of the act gives a recommitted parole violator a credit on the maximum term equal to the time served on parole.
>
> entitled to good time the same as if he were confined in prison.

tion of the parole authority. See 67A C.J.S. *Pardon and Parole* § 82(a), at 153–54 & nn. 76–80 (1978 & Supp.1996).

9. But *cf. People v. Sims,* 38 Mich.App. 127, 195 N.W.2d 766, 768 (1972) (quoting Michigan statute):

> A parole granted a prisoner shall be construed simply as a permit to such prisoner to go without the enclosure of the prison, and not as a release, and while so at large he shall be deemed to be still serving out the sentence imposed upon him by the court, and shall be

10. Mr. Williams criticized a provision contained in the bill, as originally submitted, which would have authorized credit for street time spent on probation. This provision was subsequently deleted from the statute as enacted.

11. Section 5(a), as previously noted, was codified as D.C.Code § 24–431(a).

At the conclusion of her answer to this question, Ms. Hines explained that the Council was apparently unaware of the inconsistent provision in Section 24–206(a) when it enacted Section 24–431(a). See page 1109, *supra*.

On September 16, 1987, Patrick S. Glynn, the General Counsel for the USPC, wrote a letter to Corporation Counsel Frederick D. Cooke, Jr., in which he expressed his disagreement with Ms. Hines' interpretation. Mr. Glynn argued that "a specific statute must always take precedence over a statute of general applicability, regardless of priority of enactment." He also expressed the view that "the Councilmembers could not have intended to benefit a category of offenders that includes many of our most dangerous recidivists."

On October 30, 1987, Mr. Cooke responded to Mr. Glynn's submission with a comprehensive five-page letter in which he discussed the meaning of Section 24–431(a) in considerable detail. Mr. Cooke noted, *inter alia*, that one of the principal purposes of the GTCA was to relieve prison overcrowding, and that "construing [Section 24–431(a)] to provide for credit against the maximum sentence for time served on parole, even when parole is later revoked, accords with this principal purpose." Addressing the legislative history of the GTCA, Mr. Cooke quoted the section-by-section analysis of the statute in the Report of the Judiciary Committee. In that Report, the language that "ended up" as Section 5(a) was described as follows:

> Requires that a person be given credit for time spent in custody and time spent on parole.

COMMITTEE REPORT, at 3. Mr. Cooke pointed out that the Report specified no exceptions to the foregoing requirement, and he wrote that

> [i]f the last sentence of D.C.Code § 24–206(a) (1981) had been brought to the Committee's attention, and the Committee had intended that sentence to remain an

exception, it would likely have so indicated in the section-by-section analysis.[12]

Finally, the Corporation Counsel stated:

> [Y]our limiting construction of the phrase "or on parole" in § 5(a) of the act renders that phrase superfluous. For if that phrase means only what you have construed it to mean, its elimination would not change the state of the law in any way. This is so because pre-existing law makes quite clear the general rule, namely that time served on parole is time served in fulfillment of the maximum sentence.

\* \* \* \*

> Of course, "... a court must, if possible, give effect to every phrase of a statute so that no part is rendered superfluous." *National Insulation Transp. Committee v. Interstate Commerce Comm'n*, 221 U.S.App. D.C. 192, 196, 683 F.2d 533, 537 (1982).

### C. Implementation by the agencies.

The other District of Columbia agencies concerned with the implementation of the GTCA have likewise construed Section 24–431(a) as providing for credit for street time irrespective of whether parole is subsequently revoked. On May 22, 1987, in conformity with the Hines Memorandum, the DOC issued an Order which provided as follows:

> Every resident returned to custody as a parole violator shall be given credit for time spent on parole after 11 April 1987 until the time that the parole violation warrant is executed.

DOC Order 4340.2, quoted in *Luck I, supra*, 617 A.2d at 512. On February 19, 1988, the same agency adopted a regulation which states:

> Revocation of parole shall not result in a loss of credit, for the time spent on parole, toward service of the sentence on which parole was granted.

28 DCMR § 601.7 (1988). It appears to be undisputed that, in conformity with these regulations, the BOP has granted credit for

---

12. Mr. Cooke expressed his agreement with Ms. Hines' conclusion that Section 24–206(a) proba-

bly was not brought to the Committee's attention at all.

street time to many hundreds of parolees whose parole has been revoked.

### D. *Luck I and M.A.P. v. Ryan.*

The judiciary is the final authority responsible for deciding issues of statutory construction, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984), for "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *see also Harris v. District of Columbia Office of Worker's Compensation*, 660 A.2d 404, 407 (D.C.1995). Nevertheless, as we reiterated in *Luck I*—a case in which, as here, the relationship between Sections 24–206 and 24–431(a) was at issue—

> [t]his court accords "great weight" to any reasonable interpretation of a statute by the agency charged with its administration, and ... this is particularly true where, as here, we have a contemporaneous construction of a statute by the [agency] charged with the responsibility of setting its machinery in motion and making the parts work efficiently and smoothly while they are yet untried and new.

617 A.2d at 515 (quoting, *inter alia, Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (Cardozo, J.)).

I am at a loss to understand how, in light of *M.A.P. v. Ryan*, the majority regards itself as free to proclaim that *no deference at all* is due to the construction of the GTCA by the officials whose function it is to administer it. I find the explanation in the majority opinion to be quite unpersuasive. In *Luck I*, according to Judge Ferren, this court accorded great weight to the DOC's interpretation "merely to buttress a conclusion we already had reached." Judge Ferren implies, in oth-

er words, that the "great weight" language was dictum and that we can disregard it at our caprice.

With due respect, this is a serious misreading of our opinion in *Luck I*. In that case, we rejected a prisoner's contention that under the GTCA, he was entitled to credit for street time spent on parole prior to the effective date of the Act. In our unanimous opinion, which Judge Ferren joined, we stated in detail our reasons for refusing to accept the construction of the statute urged upon us by the prisoner. *Luck I*, 617 A.2d at 512–15. One of those reasons was that the DOC had construed the Act in a manner contrary to the prisoner's position, and that dispositive precedent required us to accord great weight to the agency's views.

There is nothing in *Luck I* to suggest that the "great weight" discussion was less significant than any other portion of the opinion. Plainly, that discussion was not a mere add-on which we included just for fun. On the contrary, we explicitly *"factor[ed] into our calculus ... [the] administrative construction of the GTCA and its interplay with Section 24–206." Id.* at 515 (emphasis added). Obviously, a point that was factored into our calculus, and was thus part of our holding, could not be dictum. It is not at all clear to me, and it cannot be clear to Judge Ferren, that in *Luck I*, the court would have reached the result that it did if the administrative construction had been to the contrary.[13]

Judge Ferren also argues that even if *Luck I* requires us to give some weight to the executive construction of the GTCA, there is no reason for "absolute obeisance." This is, of course, quite correct; the ultimate responsibility for construing the statute devolves upon this court. *Chevron, supra*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. But

---

**13.** Judge Ferren has devoted a major part of his opinion to a discussion of the pros and cons (mostly cons, according to him) of judicial deference to executive construction in this kind of case. In my opinion, *Luck I* is dispositive as to the weight to be accorded to that construction in the present case. Accordingly, I will not prolong this dissenting opinion by debating the question whether, and to what extent, we would be obliged to defer in this case if *Luck I* had not

been decided. I suggest, however, that Justice Cardozo's opinion in *Norwegian Nitrogen Products Co.*, 288 U.S. at 315, 53 S.Ct. at 358, quoted in *Luck I*, as well as the numerous cases that have followed *Norwegian Nitrogen Products Co.*, all contemplate that courts should accord great weight to agency construction in a substantially broader category of cases than Judge Ferren suggests.

"great weight" means *great* weight, not an inconsequential milligram. The question before us is whether the interpretation of the GTCA by the District of Columbia officials who enforce it is a reasonable one. *Id.* at 845, 104 S.Ct. at 2783. In this case, those officials have construed the act in a manner consistent with its unambiguous language, and their construction is manifestly reasonable.

### E. *"Great weight" and the deference due.*

"[T]he deference which courts owe to the interpretation by agencies of statutes which they administer is at its zenith where the administrative construction has been consistent and of long standing." *James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 48 (D.C.1989) (citation omitted). The executive construction of Section 24–431(a) by District of Columbia officials has been consistent for almost a decade.

In *Luck I,* we applied the "great weight" principle solely on the basis of DOC Order No. 4340.2. In the present case, the force of the DOC's position is enhanced by the BOP's practice over a period of ten years[14] and, especially, by the interpretation of the relevant provisions by the Corporation Counsel.[15] The view of the Corporation Counsel as to the meaning of local statutes, "while not binding on this court, is entitled to great weight." *National Org. of Women v. Mutual of Omaha Ins. Co.,* 531 A.2d 274, 278 (D.C.

1987). In a context such as the present one, in which the Corporation Counsel acted in his capacity as legal adviser to District of Columbia agencies, rather than as a party to contested litigation, we should adopt the Corporation Counsel's construction "unless plainly unreasonable or contrary to ascertainable legislative intent." *Jordan v. District of Columbia,* 362 A.2d 114, 118 (D.C.1976) (quoting *Williams v. W.M.A. Transit Co.,* 153 U.S.App. D.C. 183, 189, 472 F.2d 1258, 1264 (1972) (Leventhal, J.)).[16]

The views of the Corporation Counsel are especially significant in this case. Corporation Counsel's responsibility to represent the interests of the District and its citizens from a law enforcement perspective often places him in an adversarial position vis-a-vis the claims of prisoners. *See, e.g., Luck I, supra; Winters v. Ridley,* 596 A.2d 569, 576–79 (D.C. 1991) (per curiam);[17] *Abdullah v. Roach,* 668 A.2d 801 (D.C.1995); *White v. Hyman,* 647 A.2d 1175 (D.C.1994). Indeed, the District's position in successive cases involving Sections 24–206(a) and 24–431(a)—Corporation Counsel opposed the prisoner's more extreme claim in *Luck I* but supported Noble's more modest one here—reflects an objective and impartial approach, a circumstance that should reinforce our disposition to accord weight to the District's construction.

The USPC contends that "[t]he [c]ourt owes no special deference" to the DOC's

---

**14.** See *National Treas. Employees Union v. United States Merit Sys. Protection Bd.,* 240 U.S.App. D.C. 51, 72–73, 743 F.2d 895, 916–17 (1984) (administrative construction by two agencies).

**15.** In one rather startling passage of his opinion, Judge Ferren tells us that the DOC "apparently relied in its analysis exclusively on the Hines memorandum from the Corporation Counsel's office." *Maj. op.* at p. 1098. He adds that this reliance was "entirely appropriate" but that it nevertheless "reveals the absence of any expert input by the [DOC] itself." *Id.* From this, Judge Ferren concludes that we have before us "entirely a legal question" and that there is no reason to accord the agency's view any weight. Under this theory, an agency that wants the court to defer to its judgment can most effectively attain this end by declining to obtain legal advice.

**16.** The Corporation Counsel is the highest ranking legal officer in the District's executive

branch. His position is roughly analogous, in this regard, to that of the Attorney General of a state. In the absence of controlling judicial authority, courts accord great weight to the opinions of state attorneys general with respect to the construction of state statutes. *See, e.g., Phyle v. Duffy,* 334 U.S. 431, 441, 68 S.Ct. 1131, 1135–36, 92 L.Ed. 1494 (1948); *McDowell v. Good Chevrolet–Cadillac,* 397 Pa. 237, 154 A.2d 497, 501 (1959); 2B SUTHERLAND, *supra,* § 49.05 at 16 & n. 7; *see also Rodriguez–Padron v. INS,* 13 F.3d 1455, 1460 (11th Cir.1994) (deportation case; United States Attorney General's reasonable interpretation of statutory immigration scheme is entitled to deference). The authorities in this jurisdiction according great weight to the Corporation Counsel's opinions are thus consistent with the case law elsewhere.

**17.** In *Winters,* the District successfully argued that prisoners who had been convicted of first-degree murder were not entitled to credit for good time.

interpretation of Sections 24–206 and 24–431(a). It further argues that because it (the USPC) is also entrusted with administering District of Columbia parole laws, its interpretation "cannot be ignored." In my view, the first of these contentions is foreclosed by our opinion in *Luck I*. With respect to the USPC's second point, I agree that the Commission's views should be given some consideration. I note, however, that federal appellate courts have rejected the USPC's attempt to apply federal standards to District of Columbia legislation. *See, e.g., Thomas v. Brennan*, 961 F.2d 612, 617 (7th Cir.1992). Moreover, the United States Court of Appeals having certified the present case to this court in order to resolve a controlling question of District of Columbia law, it would be somewhat incongruous for us to be unduly deferential to the views of a federal agency as to the proper construction of our local statutory scheme.[18]

## III.

## STRICT CONSTRUCTION OF PENAL STATUTES

Noble further argues that Section 24–431(a) is a statute governing criminal penalties, and that if we find its language and executive construction inconclusive, then we should resolve any ambiguity in his favor. We have described the principle that criminal statutes are to be strictly construed as a "secondary" rule of construction, which can "tip the balance in favor of criminal defendants only where, exclusive of the rule, a penal statute's language, structure, purpose and legislative history leave its meaning genuinely in doubt." *Lemon v. United States*, 564 A.2d 1368, 1381 (D.C.1989) (citation omitted); *Luck I, supra*, 617 A.2d at 515. The rule of strict construction "only serves as an aid to resolving an ambiguity; it is not to be used to beget one." *Callanan v. United States*, 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961). If we assume, however, that the language and executive construction of the GTCA leave any room for doubt as to the Act's meaning, then this is the kind of case in which Noble and others similarly situated are entitled to the benefit of that doubt.

"The rule that penal laws are to be construed strictly is perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820) (Marshall, C.J.). It applies not only to interpretations of the substantive ambit of criminal proscriptions, but also to the penalties they impose. *Lemon, supra*, 564 A.2d at 1381 (citing *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980)); *see also Luck I, supra*, 617 A.2d at 515. The rule "embodies the instinctive distaste against men [and women] languishing in prison unless the lawmaker

18. The District contends that the executive construction of the GTCA should be accorded an especially high level of deference because the Council of the District of Columbia is said to have acquiesced in it. The District points out that in 1988, 1991 and 1994, the Council made significant changes in the GTCA as a result of judicial or administrative interpretations with which the Council disagreed. *See, e.g., Winters, supra*, 596 A.2d at 571 (Schwelb, J., concurring) (describing the Council's "swift and emphatic" reaction against federal court ruling authorizing good time credit for first degree murderers).

There is some support in the case law for the District's position. "Acquiescence by Congress in an administrative practice may be an inference from silence during a period of years." *Norwegian Nitrogen Co., supra*, 288 U.S. at 313, 53 S.Ct. at 357; *see also EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981); *Marshall v. District of Columbia Rental Hous. Comm'n*, 533 A.2d 1271, 1276 (D.C.1987). "[A] consistent administrative interpretation of a statute, *shown clearly to have been brought to the attention of Congress and not changed by it,* is almost conclusive evidence that the interpretation has congressional approval." *Kay v. FCC*, 143 U.S.App. D.C. 223, 231–32, 443 F.2d 638, 646–47 (1970) (emphasis added) (footnote omitted). "Legislative silence cannot mean ratification, [on the other hand], unless, as a minimum, the existence of the administrative practice is brought home to the legislature." *Thompson v. Clifford*, 132 U.S.App. D.C. 351, 361, 408 F.2d 154, 164 (1968) (footnote omitted).

In the present case, there is no direct evidence that the Councilmembers were aware of the disfavored executive construction; at most, the Council's reaction to the construction by courts or agencies of other provisions suggests, but does not prove, that our legislature knew at relevant times what the DOC was doing. Accordingly, the failure of successive Councils to amend the statute, while perhaps supportive in some measure of the District's position, is not conclusive.

has clearly said they should." *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) (citation omitted); *Luck I, supra,* 617 A.2d at 515.

In the present case, the USPC essentially contends, and the majority holds, that Section 24–431(a) should be read as meaning something quite different from what its words seem so plainly to say. As we explained in *District of Columbia v. Riggs Nat'l Bank,* 581 A.2d 1229 (D.C.1990), however, "[s]tatutes imposing penalties *will not be construed to include anything beyond their letter, even though it may be within their spirit." Id.* at 1262 (emphasis added) (citations omitted).

Regardless of what we may think the Councilmembers had in mind, *Riggs* tells us that we ought not to countenance a restriction upon a defendant's liberty unless we are satisfied that such a restriction is within the letter of what the Council said. The text of a statute is not to be stretched or expanded to put men or women in prison or to keep them there. Here, the legislature decreed that *every* person in custody *or on parole* shall be entitled to credit for street time. Even if—and it is a very big "if"—the majority's assessment of the Council's subjective intent were correct, the authorities I have cited would preclude the construction of this penal statute beyond its language where the effect of that construction would be to impair the liberty of the citizen.

## IV.

### CONCLUSION

In its brief as *amicus curiae,* the District of Columbia informs us that during the period from 1987 to 1995, the BOP revoked the parole of an average of approximately one thousand offenders per year. There have thus been about ten thousand parole revocations since the GTCA came into effect. We have no information as to how many of the defendants whose parole was revoked have

been released from the custody of the DOC, but the number is obviously quite substantial. Each defendant so released has received credit for street time spent on parole since the effective date of the Act. Under the majority's construction of the GTCA, all of these defendants should have been required to serve additional time in custody. Some of them should doubtless still be in prison.

The potential impact of the majority's ruling should not be underestimated. I quote from the brief filed by the District of Columbia:

> If the United States' interpretation prevails in this case and the [c]ourt rules that D.C. offenders have no entitlement to street time credit, the ruling would have a significant effect on the administration of the District's prisons, and could create chaos in the retroactive adjustment of the sentences of parole-violators. Many such offenders have already been released from their sentences with credit for time spent on parole. The possibility that the District might have to search for and reincarcerate ex-offenders who have been told that their sentences have lapsed would create confusion and ill-will in the District's prison system, and would aggravate over-crowding in the system.

(Footnote omitted.)

The court's decision today is being delivered by a house divided. The construction of the GTCA which I have urged in this dissenting opinion has also been adopted by the United States District Judge who initially heard this case, *see Noble v. United States Parole Comm'n,* 887 F.Supp. 11, 12–14 (D.D.C.1995) (*Noble I* ), by Judge Alprin of the Superior Court, *see Beaty, supra,*[19] and by the Corporation Counsel, the BOP, and the DOC. The USPC and one federal appellate court, however, have taken a different position, *see Tyler v. United States,* 929 F.2d 451 (9th Cir.1991), *cert. denied,* 502 U.S. 845, 112 S.Ct. 142, 116 L.Ed.2d 108 (1991),[20] and

**19.** The District informs us that its position in this case has also been sustained in several other unreported Superior Court cases.

**20.** In *Tyler,* the court rejected the interpretation of the GTCA, a District of Columbia statute, by

District of Columbia officials, and concluded that Section 24–431(a) did not implicitly repeal Section 24–206(a). With due respect for the views of the court in *Tyler,* I am not at all persuaded by the decision in that case. *Cf. Luck I, supra,* 617 A.2d at 514 n. 6 (rejecting *Tyler* analysis); *see*

District of Columbia prisoners in federal custody whose parole has been revoked have not received credit for street time and have spent more time behind prison walls than their otherwise similarly situated counterparts at Lorton.

The liberty interests of many citizens are at issue in this case. The District of Columbia advises us that the United States Court of Appeals for the Tenth Circuit has stayed proceedings in a case raising the same issue pending this court's ruling in the present case. *Johnson v. Kindt*, No. 96–6154 (10th Cir.).[21] The question certified to us is undoubtedly one of exceptional public importance. I therefore believe that our federal appellate colleagues should receive an answer to the certified question from our full court, sitting en banc.

I respectfully dissent.

*also Beaty v. Ridley, supra,* in which Judge Alprin concluded that the *Tyler* case "improperly interpreted D.C.Code § 24–206(a) to preempt the broad language of the GTCA," and pointed out that under *Tyler,* there would be few if any instances in which Section 24–431(a) would apply.

**21.** In *Johnson,* according to the District, the trial judge adopted the District's construction of the GTCA.